UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC d/b/a EMI MUSIC NORTH AMERICA,<br><br>                      Plaintiff,<br><br>    – against –<br><br>ESCAPE MEDIA GROUP, INC.,<br><br>                      Defendant. | No. 12 Civ 06646 (AJN) (SN)<br><br>ECF CASE |

### DECLARATION OF ALASDAIR MCMULLAN
### IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ALASDAIR MCMULLAN, declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am currently a Senior Vice President of Business and Legal Affairs for UMG Recordings, Inc. ("UMG"), whose indirect parent company acquired Plaintiff Capitol Records, LLC, d/b/a EMI Music North America ("Plaintiff" or "EMI") after the start of this litigation.[1] I started working at EMI in 1995, eventually rising to Executive Vice President of Legal Affairs before transitioning my employment to UMG in January 2013. In my capacity as in-house counsel for EMI and later UMG, among other things, I have at all times managed and supervised this litigation on behalf of EMI.

2. As will be detailed in greater length in this Declaration, EMI owns, or has the exclusive right in the United States to exploit and enforce, copyrights in and to a catalog of sound recordings, including works first fixed both before and after February 15, 1972 (the "EMI Recordings").

---

[1] Attached hereto as Exhibit 1 is a true and correct copy of the Supplemental Rule 7.1 Statement filed by EMI in this Action on November 12, 2012 (Docket Entry No. 17), which notes "Universal Music Holdings, Ltd." as having a direct or indirect ownership interest in Capitol Records, LLC (formerly Capitol Records, Inc.).

3. [Intentionally omitted].

4. Through my employment and responsibilities as in-house counsel at EMI (and later Universal Music Group) since 1995, I am familiar with the books and records of EMI, including documents such as copyright certificates and agreements (including those referenced in this Declaration) pursuant to which EMI possesses rights in the EMI Recordings. I submit this Declaration in support of EMI's motion for summary judgment against defendant Escape Media Group, Inc. ("Defendant" or "Escape") on EMI's claims for copyright infringement. If called upon to do so, I could and would competently testify to the matters stated herein.

## ESCAPE IS NOT AUTHORIZED
## TO EXPLOIT EMI RECORDINGS

5. In or about 2009, EMI discovered that Escape's "Grooveshark"[2] service was exploiting many EMI Recordings without authorization. This unauthorized use involved reproducing, distributing and publicly performing EMI Recordings by way of digital streaming technology. As a result, EMI commenced a lawsuit against Escape in this Court (Index No. 09-CIV-4458 (LMM), hereinafter the "First Action"), in which EMI asserted claims relating to Escape's copyright infringement and unauthorized exploitation of EMI Recordings.

6. EMI and Escape subsequently entered into a "Settlement Agreement and Mutual Release" effective as of September 24, 2009 (the "Settlement Agreement"), by which the parties settled the claims in the First Action respecting Escape's unauthorized exploitation of EMI Recordings prior to the effective date of the Settlement Agreement. Attached hereto as Exhibit 2 is a true and correct copy of the Settlement Agreement (ESCAPE (CAP)_000260).

---

[2] "Grooveshark" refers to the various websites owned and operated by Escape, including www.grooveshark.com, listen.grooveshark.com, www.tinysong.com, and all of their associated mobile applications, collectively branded "Grooveshark."

7. I participated in the negotiation and execution of the Settlement Agreement on behalf of EMI.

8. In the Settlement Agreement, Escape expressly acknowledged that EMI "owns and/or controls rights in and to various sound recordings (such sound recordings, the copyright and/or equivalent rights to which are owned and/or controlled by EMI Music are collectively referred to herein as the 'EMI Recordings'...)." (Ex. 2 at 1.) Defendant further acknowledged in the Settlement Agreement that "the Grooveshark Sites, *inter alia*, enable and facilitate users' search, play, and creation of playlists from streaming user-uploaded digital content files (including but not limited to full-length audio recordings) (the 'Grooveshark Service')." (*Id.*)

9. Recognizing EMI's rights in and to the EMI Recordings and the nature of the Grooveshark service, Escape further expressly agreed that it would not exploit, or allow others to exploit, any EMI Recordings without a written license from EMI. Paragraph 1.1 of the Settlement Agreement provides:

> 1. Future Conduct by Escape Media With Respect to EMI Recordings.
>
> 1.1. **From and after** the date hereof, **Escape Media shall not allow the copying, reproduction, distribution, public performance, and/or other exploitation of EMI Recordings on, via, and/or in connection with the Grooveshark Sites**, and/or any other website, server, system, or software under the control of Escape Media and/or an affiliate of Escape Media on which can occur the unauthorized copying, reproduction, distribution, public performance, downloading, and/or other exploitation of EMI Recordings (each, a "Comparable Service"), **except pursuant to a valid and binding agreement allowing such copying, reproduction, distribution, public performance, and/or other exploitation of EMI Recordings (an "EMI Content Agreement")**, in accordance with the terms of such EMI Content Agreement. (Ex. 2 ¶ 1.1) (emphasis supplied).

10. Thus, Escape expressly acknowledged in the Settlement Agreement that, from and after its effective date, Escape required a license to, or to allow others to, copy, reproduce, distribute, publicly perform, and/or otherwise exploit EMI Recordings on Grooveshark. Escape

3

expressly agreed that it would only allow such use of EMI Recordings pursuant to an approved agreement permitting the use of EMI Recordings. The parties broadly defined EMI Recordings as "sound recordings, the copyright and/or equivalent rights to which are owned and/or controlled by EMI Music..." – in other words, all sound recordings owned and/or controlled by EMI.

11. Consistent with these express agreements, Escape entered into such an "EMI Content Agreement" with EMI Music Marketing, a division of EMI, entitled, "Digital Distribution Agreement" dated and effective as of September 24, 2009 (the "Distribution Agreement"). Attached hereto as Exhibit 3 is a true and correct copy of the Distribution Agreement (ESCAPE (CAP)_000211). Pursuant to the Distribution Agreement, EMI granted Escape the right to distribute certain EMI Recordings, solely as embodied in digital streams ("Streams") in accordance with Product Schedule F.1. Attached hereto as Exhibit 4 is a true and correct copy of Product Schedule F.1 (ESCAPE (CAP)_000246).

12. The Distribution Agreement expressly set out Escape's rights and obligations in connection with the exploitation of the "EMI Content" licensed to Escape, as defined therein. *See* (Ex. 3 ¶ 1.2 & Ex. 3 at Ex. 1 ¶ 1.19). Pursuant to the Distribution Agreement, Escape was only permitted to exploit authorized EMI Content that was provided by EMI to Escape. (Ex. 3 ¶ 4.2) ("[U]se of EMI Content obtained from any entity other than EMI or an Approved Source is a material breach of [the Distribution Agreement].") EMI Content was defined in the Distribution Agreement as, generally speaking, "content made available by EMI to Distributor [Escape]..." *See* (Ex. 3 at Ex. 1 ¶ 1.19). This Content would be provided to Escape via EMI's digital supply chain. (Ex. 3 ¶ 4.2).

4

13. I participated in the negotiation and execution of the Settlement Agreement, the Distribution Agreement and the Production Schedule F.1 on EMI's behalf, and have firsthand knowledge of Escape's compliance, and lack thereof, with the terms of both the Distribution and Settlement Agreements.

14. EMI granted these rights to Escape in exchange for certain settlement payments for past infringements, as well as Escape's agreement to furnish both monthly accounting statements and weekly exploitation reports (collectively, and as defined in the Distribution Agreement, "Sales Reports"), in compliance with the detailed reporting guidelines set forth in the Distribution Agreement, along with the accompanying monthly payments due. *See* (Ex. 3 ¶ 8.1 & Ex. 3 at Ex. 2 ¶ 1(a)).

15. Although Escape paid over ▇▇▇▇▇▇▇ under the Distribution Agreement for the valuable rights EMI granted to Escape, this was only a fraction of what Escape agreed to pay for the ability to exploit EMI's valuable catalog of sound recordings. Escape repeatedly breached both the Settlement and Distribution Agreements by failing to, *inter alia*, (1) render the settlement payments due; (2) render the weekly and monthly Sales Reports; (3) render the monthly payments due; and (4) properly block unauthorized distribution of EMI intellectual property on Grooveshark.

16. During the term of the Distribution Agreement (which had an original term of thirty (30) months), on at least two separate occasions, EMI notified Escape that it was in breach of the Distribution Agreement based upon, *inter alia*, Escape's breaches as noted above, namely Escape's exploitation of EMI Recordings that were not authorized pursuant to the terms of the Distribution Agreement and Escape's failure to properly account to EMI in accordance with the terms of the Distribution Agreement.

17. To resolve such claims, EMI and Escape entered into both a First Amendment to the Settlement and Distribution Agreements on April 21, 2011 and a Second Amendment to the Settlement and Distribution Agreements on November 29, 2011 which, in part, provided for certain specified payments by Escape and extended the term of the Distribution Agreement through September 30, 2012.

18. Despite having just resolved EMI's prior claims of breach in the Second Amendment to the Settlement and Distribution Agreement as of November 29, 2011, Escape proceeded to again breach the Distribution Agreement by failing to render Sales Reports or to properly pay the monthly payments due under the Distribution Agreement for December 2011.

19. EMI sent Escape a notice of breach letter dated January 25, 2012. Attached hereto as Exhibit 5 is a true and correct copy of the January 25, 2012 Notice of Breach Letter (ESCAPE (CAP)_001077). Escape failed to fully cure the breaches identified in EMI's January 25 Notice of Breach letter. Rather, Escape thereafter committed additional breaches by failing to make payments or provide Sales Reports for the months of January and February 2012. Prior to these breaches, Escape had been required to pay EMI license fees which averaged ▮▮▮▮ per month under the Distribution Agreement.

20. As a result of Escape's consistent breaches of the Settlement Agreement, Distribution Agreement, and each and every amendment thereto, EMI terminated the Distribution Agreement by letter dated March 22, 2012. Attached hereto as Exhibit 6 is a true and correct copy of the March 22, 2012 Termination Letter (ESCAPE (CAP)_000301).

21. The Settlement Agreement has not been terminated, and as such remains in full force and effect. Nonetheless, since the termination of the Distribution Agreement, Escape has taken no efforts to prevent "the copying, reproduction, distribution, public performance, and/or

other exploitation of EMI Recordings on, via, and/or in connection with the Grooveshark Sites," in spite of its lack of an EMI Content Agreement as required under the Settlement Agreement. (Ex. 1 ¶ 1.1). Despite the lack of any license from EMI to Defendant, Escape has continued to allow, without restriction, the upload and streaming of any and all EMI Recordings on Grooveshark.

22. As such, on August 30, 2012, EMI was, once again, forced to bring suit against Escape, by way of the present Action. EMI's Complaint includes claims for (1) federal copyright infringement of its Post-72 sound recordings; (2) breach of the Distribution Agreement; (3) breach of the Settlement Agreement; (4) unjust enrichment; (5) unfair competition; and (6) common law copyright infringement of its Pre-1972 sound recordings. EMI is seeking damages, including interest, costs and attorneys' fees, as provided by the Copyright Act and under the Settlement and Distribution Agreements. Attached to EMI's Complaint as Exhibits A and B are examples of EMI Recordings that were infringed by Escape. During discovery, EMI has identified additional EMI Recordings infringed by Escape. Below, I present proof of EMI's ownership of or exclusive rights to the EMI Recordings.

23. In July 2013, Escape stipulated as to liability on EMI's Second Claim for breach of the Distribution Agreement, based on its failure to deliver the required monthly Sales Reports and corresponding payments for the months of December 2011 to March 22, 2012. (Docket Entry No. 24).

24. While not at issue on this motion, EMI sought, both in the interests of efficiency and at the Court's direction, to resolve the damages portion of EMI's Second Claim with Escape. While the parties had available to them a reasonable method of determining damages – the prior monthly payments made by Escape to EMI under the Distribution Agreement, which could be

7

used as a proxy for the amounts due for the missing months – Escape refused to engage in any discussion or negotiation with EMI as to the amount due for the missing four months. Rather, Escape contended that the interests of judicial efficiency somehow dictated that a full-blown jury trial was required on EMI's contract damages. EMI of course will seek a judicial determination as to these damages, including the 18% interest that continues to accrue, costs and attorneys' fees due to EMI pursuant to the Distribution Agreement. (Ex. 3 ¶ 8.2; Ex. 3 at Ex. 2 ¶ 2(d)).

25. Also, while I understand that the parties have stipulated as to liability on its Second Claim for breach of the Distribution Agreement (EMI's Third Claim for Breach of the Settlement Agreement remains), I have summarized the contractual background between the parties because it highlights the bad faith nature of Escape's professed reliance on the safe harbor protections of the DMCA, and its professed ignorance as a supposed "innocent" service provider, while exploiting EMI's valuable rights without the license it agreed it required. I personally dealt with the senior executives of Escape for over 3 years. Escape knew perfectly well of the value and identity of EMI's Recordings when it settled the First Action, was provided with EMI's content (as well as the metadata to identify this content in perpetuity) and expressly agreed not to exploit (in perpetuity) EMI's valuable intellectual property without license. It paid EMI over ▓▓▓▓▓▓▓ for those valuable and recognized rights, until it realized it was cheaper to pay its attorneys to defend infringement claims – which could take years to resolve – while Escape operated without paying EMI or its artists a dime in licensing fees.

26. Escape has had no authorization to exploit any rights in EMI Recordings in any manner since the termination of the Distribution Agreement on March 22, 2012. Likewise, Escape's users are not authorized to copy or perform, or authorize the copying or performance, of the EMI Recordings on the Grooveshark service.

## EMI'S OWNERSHIP OF THE SOUND RECORDINGS AT ISSUE

27. EMI owns, or has the exclusive rights in the United States to enforce, copyrights in and to the 2,579 sound recordings listed on Exhibit 7 hereto, all of which were first fixed on or after February 15, 1972 ("Post-72 Works").

28. EMI also owns, or has the exclusive rights in the United States to enforce, rights in and to the 228 sound recordings listed on Exhibit 8 hereto, all of which were first fixed prior to February 15, 1972 ("Pre-72 Works") ("Post-72 Works" and "Pre-72 Works" collectively referred to as the "EMI Works").

## POST-72 WORKS

29. EMI possesses (and exploits) its rights, among other things, to reproduce the Post-72 Works in copies or phonorecords, to distribute copies or phonorecords of the Post-72 Works to the public, to perform the Post-72 Works publicly by means of a digital audio transmission, and to license these exclusive rights, including the exercise of these rights over the Internet.

30. Certificates of Registration ("Certificates") for each of the Post-72 Works are submitted herewith. A sample Certificate is attached to this Declaration as Exhibit 9.[3] True and correct copies of the Certificates for each of the sound recordings listed on Exhibit 7 to this Declaration are provided in electronic form due to their volume, and incorporated by reference as though attached to this Declaration. Exhibit 7 to this Declaration lists, for each such sound recording, the copyright claimant, the SR registration number issued by the U.S. Copyright Office and the Bates Number range for the relevant Certificate. EMI's ownership or control of

---

[3] Some of the documents attached as Exhibits as described herein may contain two Bates numbers in the bottom right corner of the document. In these cases, the Bates number closest to the bottom of the page controls and is the Bates number referenced in this Declaration and in Exhibits 7 and 8 hereto. For instance, in the sample Certificate at Exhibit 9, the Bates number "EMI 007463" controls over Bates number "EMI-R 000292." For the sake of clarity, documents bearing a single Bates number are referenced by that Bates number.

9

these copyrights also can be confirmed via publicly available information, such as through the United States Copyright Office website.

### PRE-72 WORKS

31. EMI's rights in and to the Pre-72 Works can be confirmed via publicly available information such as liner notes accompanying the packaging of such sound recordings.

32. EMI also submits in electronic form true and correct copies of the relevant portions of contracts between EMI (or it predecessors or affiliates) and the artists regarding rights in the sound recordings ("Pre-1972 Artist Agreements"). Exhibit 8 to this Declaration lists, for each of the Pre-72 Works, the relevant contracting party (whose relationship to EMI is described herein), as well as the beginning Bates Number for the relevant Pre-1972 Artist Agreements (except in a few instances in which EMI has provided an alternate explanation or documentation of its ownership or exclusive rights to certain works).

33. I will next discuss EMI's ownership of the EMI Works.

### Chain of Title For The Post-72 Works

34. Exhibit 7 hereto is a spreadsheet that identifies 2,579 sound recordings owned or controlled by EMI. Each of these recordings is registered with the U.S. Copyright Office, as is reflected in the 323 Certificates identified in Exhibit 7.

35. The majority of the Certificates identify "Capitol Records, Inc.," "Capitol Records Inc.," "Capitol Records," "Capitol Records, LLC," or one of their "divisions" as the "copyright claimant." Capitol Records, LLC formerly was known as Capitol Records, Inc., having undergone a conversion to LLC form as of April 1, 2008. Attached hereto as Exhibit 10 is a true and correct copy of a March 31, 2008 Certificate of Conversion to Limited Liability Company (EMI 012669).

36.     23 of the Certificates identify as the "copyright claimant" a fictitious business name (or d/b/a) for divisions through which Capitol Records, LLC (f/k/a Capitol Records, Inc.) conducted or presently conducts business. These fictitious business names include: "Angel Records," "Blue Note Records," "Chrysalis Records," "Chrysalis/EMI Records," "EMI Latin," "EMI Records," "EMI Records Group," "EMI Records Group North America," "EMI Records Nashville," "SBK Records," and "SBK/EMI Records." Attached hereto as Exhibits 11.1 to 11.6 are true and correct copies of certain Fictitious Business Name Statements and Certificates of Assumed Name (EMI 012695; EMI 023096; EMI 012714; EMI 012682; EMI 023092; EMI 012708).

37.     51 of the Certificates identify "Virgin Records America, Inc.," or "Virgin Records America Inc.," as the "copyright claimant." Virgin Records America, Inc. was a record label affiliate of EMI. By way of an Agreement and Plan of Merger dated August 15, 2011, Virgin Records America, Inc. merged into Capitol Records, LLC. As a result, Virgin Records America, Inc. has been merged into the surviving limited liability company Capitol Records, LLC, which is now the direct holder of all the assets of Virgin Records America, Inc. including its catalogs of sound recordings and all rights therein. Attached hereto as Exhibit 12 is a true and correct copy of the Certificate of Merger of The Mute Corporation, Virgin Records America, Inc., Caroline Records, Inc. and EMI Group North American Venture Fund, Inc. into Capitol Records, LLC (EMI 016972).

38.     The remainder of the Certificates identify other entities as the "copyright claimant." As described in the following paragraphs, Capitol Records, LLC owns or exclusively controls the copyright in all of the works listed in these registrations:

11

(a) Nine of the Certificates identify "Caroline Records, Inc.," or "Caroline Records" (collectively "Caroline") as the "copyright claimant." By way of an Agreement and Plan of Merger dated August 15, 2011, Caroline Records, Inc. merged into Capitol Records, LLC. As a result, Caroline has been merged into the surviving limited liability company Capitol Records, LLC, which is now the direct holder of all the assets of Caroline including its catalogs of sound recordings. Attached hereto as Exhibit 12 is a true and correct copy of the Certificate of Merger of The Mute Corporation, Virgin Records America, Inc., Caroline Records, Inc. and EMI Group North American Venture Fund, Inc. into Capitol Records, LLC (EMI 016972).

(i) One of the Certificates identifies "Astralwerks" as the "copyright claimant." "Astralwerks" was a fictitious business name (or d/b/a) through which Caroline Records, Inc. conducted business. Attached hereto as Exhibit 13 is a true and correct copy of Caroline Records, Inc.'s Certificates of Assumed Name as "Astralwerks" (EMI 012678). By way of an Agreement and Plan of Merger dated August 15, 2011, Caroline Records, Inc. has merged into the surviving limited liability company Capitol Records, LLC (*see* ¶ 38(a)).

(b) One of the Certificates identifies "Charisma Records America, Inc." as the "copyright claimant." On March 31, 2004, Charisma Records America, Inc. merged into Virgin Records America, Inc. As a result, Charisma Records America, Inc. has merged into the Surviving Corporation Virgin Records America, Inc. which became the direct holder of all the assets of Charisma Records, Inc. including its catalogs of sound recordings. Attached hereto as Exhibit 14 is a true and correct copy of a relevant excerpt to the Agreement and Plan of Merger by and between Charisma Records America, Inc. and Virgin Records America, Inc. (EMI 012676). As noted above, by way of an Agreement and Plan of Merger dated August 15, 2011,

12

Virgin Records America, Inc. has merged into the surviving limited liability company Capitol Records, LLC, which as a result now owns and controls exclusive rights in these sound recordings (*see* ¶ 37 and Exhibit 12).

(c) 26 of the Certificates identify "Chrysalis Records," "Chrysalis Records, Inc.," "Chrysalis Records Inc.," "Chrysalis/EMI Records," or "Chrysalis Records, Ltd.," as the "copyright claimant."

(i) The majority of the works encompassed by Certificates identifying "Chrysalis Records" or "Chrysalis Records, Inc." came to Capitol Records, Inc. through a December 31, 1993 merger with Terwright Records, Inc., a California corporation that was the sole owner of the Chrysalis Records catalog which did business as Chrysalis Records and Chrysalis Records, Inc. As a result of this merger, Capitol Records, Inc. became the direct holder of all of Terwright's assets, including its catalog of sound recordings, its Chrysalis business entities and all further releases therefrom. Further, on October 27, 1994 Capitol Records, Inc. registered both the fictitious business names "Chrysalis Records" and "EMI Records" for divisions through which Capitol Records, Inc. conducted business (*see* ¶ 36). As explained in Paragraph 35, Capitol Records, Inc. is now Plaintiff Capitol Records, LLC, which in turn now owns and controls exclusive rights in all the sound recordings identified in Exhibit 7 that are registered under any of the foregoing Chrysalis names.

(ii) As for the recordings covered by the Certificate identifying "Chrysalis Records, Ltd." as the claimant, Chrysalis Records, Ltd. is a wholly owned subsidiary of EMI Ltd. which is a wholly owned subsidiary of Virgin Records, Ltd. Attached hereto as Exhibit 15 is a true and correct copy of the documents by which this acquisition was consummated and completed (EMI 014633). Until March 31, 2013, Capitol Records, LLC

owned or controlled exclusive United States rights to such recordings by virtue of a June 1, 2003 written intra-company license agreement, referred to internally as the Matrix Exchange Agreement, or "MEA." Thereafter, beginning on or about April 1, 2013, Capitol Records, LLC owns or controls exclusive United States rights to such recordings by virtue of an Inter-Company License Agreement. Pursuant to the MEA (and later the ICLA), Capitol Records, LLC is the exclusive licensee in the United States of the sound recordings owned by each of its affiliated foreign companies (and, as the exclusive licensee, has full rights to enforce the copyrights under the Copyright Act). A true and correct copy of the MEA is attached hereto as Exhibit 16.1 (EMI 023098). A true and correct copy of the most current ICLA, as amended, as well as a letter agreement confirming Capitol Records, LLC's rights pursuant to the ICLA is attached hereto as Exhibit 16.2 (EMI 023426).

(d) Three of the Certificates identify "Circa Records Ltd." as the "copyright claimant" for sound recordings by the artist Massive Attack. By way of a February 9, 2000 ▮▮▮▮▮▮▮▮▮▮, a true and correct copy of which is attached hereto as Exhibit 17 (EMI 015646), Virgin Records Limited ▮▮▮▮▮▮▮ Circa Records Limited ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Capitol Records, LLC owns or controls exclusive United States rights to these recording by virtue of the June 1, 2003 MEA and, as of April 1, 2013, the ICLA (*see* ¶ 38(c)(ii)).

(e) Three of the Certificates identify "E.G. Records, Ltd." as the "copyright claimant" for sound recordings by artist Killing Joke. Virgin E.G. Records Limited (formerly known as E.G. Records Ltd.) is now an indirect wholly-owned subsidiary of Virgin Records Ltd. Capitol Records, LLC owns or controls exclusive United States rights to these recording by virtue of the June 1, 2003 MEA and, as of April 1, 2013, the ICLA (*see* ¶ 38(c)(ii)).

14

(f) Seven of the Certificates identify one of Capitol Records, LLC's foreign affiliates, including "Virgin Records, Ltd.," or "Virgin Records Ltd," as the "copyright claimant." Capitol Records, LLC owns or controls exclusive United States rights in these sound recordings by virtue of the June 1, 2003 MEA and, as of April 1, 2013, the ICLA (*see* ¶ 38(c)(ii)).

(g) One of the Certificates identifies "Grand Royal Records" as "copyright claimant" for sound recordings by the artist Luscious Jackson. Grand Royal Records and Capitol Records, Inc. are parties to a Label Agreement dated as of November 1, 1993, ███████████████████████████████████████████████████████████████ ████████ True and correct copies of relevant excerpts of the Label Agreement and correspondence relating thereto is attached as Exhibit 18 (EMI 016160). Pursuant to the March 31, 2008 Certificate of Conversion to Limited Liability Company, Capitol Records, Inc. is now Plaintiff Capitol Records, LLC (*see* ¶ 35).

(h) Two of the Certificates identify "Haworth Enterprises" as "copyright claimant" for sound recordings by the artist Steve Miller Band. Haworth Enterprises and Capitol Records, Inc. are parties to a Sales Agreement dated January 13, 1976 and Pressing Agreement dated September 1, 1975 (collectively the "Haworth Agreements") ████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ True and correct copies of relevant excerpts of the Haworth Agreements and correspondence relating thereto is attached as Exhibit 19 (EMI 015795). Pursuant to the March 31, 2008 Certificate of

15

Conversion to Limited Liability Company, Capitol Records, Inc. is now Plaintiff Capitol Records, LLC (*see* ¶ 35).

(i) Seven of the Certificates identify "International Record Syndicate, Inc.," as the "copyright claimant." On March 27, 1992, Seventh Avenue Music, Inc. purchased all of the assets of International Record Syndicate, Inc. On March 30, 1993, Seventh Avenue Music, Inc. merged into Capitol Records, Inc. As a result of the merger, Capitol Records, LLC (f/k/a Capitol Records, Inc.) is the direct holder of all the assets of Seventh Avenue Music, Inc., including its catalog of sound recordings. Pursuant to the March 31, 2008 Certificate of Conversion to Limited Liability Company, Capitol Records, Inc. is now Plaintiff Capitol Records, LLC (*see* ¶ 35).

(j) One of the Certificates identifies "Interscope Records" as the "copyright claimant" for sound recordings on the album "Bill and Ted's Bogus Journey." Interscope Records, Inc and Capitol Records, Inc. are parties to a Memorandum of Agreement dated April 14, 1991, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Attached hereto at Exhibit 20 is a true and correct copy of the April 14, 1991 Memorandum of Agreement (EMI 023952). Pursuant to the March 31, 2008 Certificate of Conversion to Limited Liability Company, Capitol Records, Inc. is now Plaintiff Capitol Records, LLC (*see* ¶ 35).

(k) Two of the Certificates identify "Liberty/United Records, Inc." as the "copyright claimant." On August 27, 1980, Liberty/United Records, Inc. changed its name to Liberty Records, Inc. Attached hereto as Exhibit 21 is a true and correct copy of the Certificate

16

of Amendment of Articles of Incorporation (EMI 015225). On April 1, 1981, Liberty Records, Inc. merged into Capitol Records, Inc. Attached hereto as Exhibit 22 is a true and correct copy of the Merger Agreement (EMI 023195). Pursuant to the March 31, 2008 Certificate of Conversion to Limited Liability Company, Capitol Records, Inc. is now Plaintiff Capitol Records, LLC (*see* ¶ 35).

(l) One of the Certificates identifies "Pendulum Records" as the "copyright claimant" for sound recordings by the artist Digable Planets. Capitol Records, Inc., along with Rogli Entertainment Corp, ███████████████████████ ███████████████████████████████████████████████████ A true and correct copy of the ████████████ dated August 16, 1993 memorializing their agreement is attached hereto as Exhibit 23 (EMI 014183). Pursuant to the March 31, 2008 Certificate of Conversion to Limited Liability Company, Capitol Records, Inc. is now Plaintiff Capitol Records, LLC (*see* ¶ 35).

(m) Three of the Certificates identify "Skint Records" or "Skint Records Ltd." as the "copyright claimant" for sound recordings by the artist Fatboy Slim. Skint Records, Ltd. and Caroline Records, Inc. are parties to an agreement dated June 3, 1997, ███████████████████████████████████████████████████ ████████████ A true and correct copy of this agreement is attached hereto as Exhibit 24 (EMI 015735). By way of an Agreement and Plan of Merger dated August 15, 2011, Caroline Records, Inc. has merged into the surviving limited liability company Capitol Records, LLC (*see* ¶ 38(a)).

17

(n) One of the Certificates identifies "Sony Music Entertainment (UK) Ltd." as the "copyright claimant" for sound recordings by the artist Manic Street Preachers. Sony Music Entertainment (UK) Ltd. and Virgin Records America, Inc. are parties to an agreement dated January 13, 1999, ███████████████████████████ ███████████████████████████████████████████ A true and correct copy of this agreement is attached hereto as Exhibit 25 (EMI 016488). By way of an Agreement and Plan of Merger dated August 15, 2011, Virgin Records America, Inc. has merged into the surviving limited liability company Capitol Records, LLC (*see* ¶ 37).

### Chain of Title For The Pre-72 Works

39. The spreadsheet attached to this Declaration as Exhibit 8 identifies the Pre-72 Works, an additional 228 sound recordings, fixed before February 15, 1972, in which EMI owns or controls exclusive rights. True and correct copies of the relevant contracts between EMI or its predecessors or affiliates, and the artist(s) (or furnishing company) are provided on a CD and indexed by leading bates number in Exhibit 8 ("Pre-1972 Capitol Artist Agreements"), except in a few instances in which EMI has provided an alternate explanation or documentation of its ownership or exclusive rights to certain works.

40. Many of the Pre-1972 Capitol Artist Agreements are between the artist(s) (or furnishing company) on the one hand, and, on the other hand, one or more of the corporate entities discussed in ¶¶ 38(a) – (n), above.

41. Some of the Pre-1972 Capitol Artist Agreements are between the relevant artist and either "Imperial Records, Inc.," "Liberty Records, Inc.," "Liberty/UA, Inc.," or "United Artists Records, Inc." The following is how Capitol Records, LLC came to own the rights under those agreements:

(a) On June 23, 1965, Imperial Records Inc. merged with and into Liberty Records, Inc. Attached hereto as Exhibit 26 is a true and correct copy of the Certificate of Ownership (EMI 015264).

(b) In January 8, 1969, Liberty Records, Inc. amended its Articles of Incorporation to change its name to "Liberty/UA Inc." Attached hereto as Exhibit 27 is a true and correct copy of the Certificate of Amendment of Articles of Incorporation (EMI 015399).

(c) On January 29, 1971, Liberty/UA, Inc. amended its Certificate of Incorporation to change its name to "United Artists Records, Inc." Attached hereto as Exhibit 28 is a true and correct copy of the Certificate of Amendment of Articles of Incorporation (EMI 015245).

(d) On August 26, 1974, "United Artists Records, Inc." changed its name to "United Artists Music and Records Group, Inc." Attached hereto as Exhibit 29 is a true and correct copy of the Certificate of Amendment of Articles of Incorporation (EMI 015247).

(e) On December 6, 1978, "United Artists Music and Records Group, Inc." changed its name to Liberty/United Records, Inc. Attached hereto as Exhibit 30 is a true and correct copy of the Certificate of Amendment of Articles of Incorporation (EMI 015224).

(f) On July 1, 1978, Capitol Records, Inc. purchased United Artists Music and Records Group, Inc. Attached hereto as Exhibit 31 is a true and correct copy of the Purchase Agreement (EMI 023167).

(g) In ¶ 38(k) above, I described that on August 27, 1980, Liberty/United Records, Inc. changed its name to Liberty Records, Inc. Attached hereto as Exhibit 21 is a true and correct copy of the Certificate of Amendment of Articles of Incorporation (EMI 015225).

(h) In ¶ 38(k) above, I described that on April 1, 1981, Liberty Records, Inc. merged into Capitol Records, Inc. Attached hereto as Exhibit 22 is a true and correct copy of the Merger Agreement (EMI 023195).

(i) In ¶ 35, above, I described that Capitol Records, Inc. changed its name to Capitol Records, LLC.

42. Some of the Pre-1972 Capitol Artist Agreements are between the relevant artist and "Sue Records." On June 28, 1967, United Artists Records, Inc. purchased masters from Sue Records, Inc. Attached hereto as Exhibit 32 is a true and correct copy of a Purchase Agreement (EMI 023209). I discussed United Artists Records, Inc. in ¶ 41(d), above.

43. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: Santa Monica, California
       December 18, 2013

_____
ALASDAIR MCMULLAN