UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————

CAPITOL RECORDS, LLC d/b/a ) 
EMI MUSIC NORTH AMERICA, )
 )
                    Plaintiff, )
 )               Case No. 12 Civ. 6646 (AJN) (SN)
          - against - )
 )
 )
ESCAPE MEDIA GROUP, INC., )
 )
                    Defendant. )

—————————————————————————

## DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE GRANTING, IN PART, AND DENYING IN PART, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**ROSENBERG & GIGER P.C.**
250 Park Avenue, 12th Floor
New York, NY 10177
(646) 494-5000

## TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Argument ................................................................................................................... 2

I.    The Magistrate Judge Erred in His Evidentiary Rulings .................................... 2

    A.  Audible Magic ............................................................................................. 3

        (i)  *EMI Indisputably Violated Rule 26(a)(2)* ....................................... 3

        (ii)  *Judge Netburn Erred in Finding that Escape Was Not Prejudiced by EMI's Late Disclosure of the Audible Magic Analysis* .................. 5

    B.  Horowitz Data Analyses ............................................................................. 6

        (i)  *Judge Netburn Erroneously Held that Late Disclosure of Horowitz's Data Analyses Was "Substanially Justified"* ................ 7

        (ii)  *Judge Netburn Erroneously Found that Late Disclosure of Horowitz's Data Analyses was "Harmless"* .................................. 9

    C.  Kowalski Declaration ................................................................................ 11

        (i)  *Escape's Failure to Formally Disclose Kowalski as a Witness Was Not a Violation of Rule 26(a)(1)* ................................ 12

        (ii)  *The Court Erred in Finding that EMI was Prejudiced by Escape's Failure to Formally Disclose Mr. Kowalski* ................... 14

II.    The Magistrate Judge's Decision Concerning EMI's Release of Claims was Erroneous ................................................................................. 16

III.    The Magistrate Judge Erred in Finding that Escape is Not Entitled to the DMCA Safe Harbor as a Matter of Law ............................... 18

    A.  Escape "Implemented" Its Repeat Infringer Policy or, at a Minimum, a Factual Issue Existed on The Issue ................................... 19

        i.  *Escape's Policy "Terminates" Accounts Sufficient for DMCA Purposes* ...................................................................... 19

        ii.  *Escape Maintains More Than Adequate Records of User Activity* ................................................................................ 21

        iii.  *Escape's Organization of User-Submitted Files Does Not Invalidate its DMCA Defense as a Matter of Law* ................... 24

B.   Judge Netburn Erred in Finding Escape's Implementation of
Its Policy Unreasonable as a Matter of Law ............................................................... 26

Conclusion ......................................................................................................................... 29

## TABLE OF AUTHORITIES

**Page**

**Cases**

Advanced Analytics, Inc. v. Citigroup Global Markets, Inc., 04 Civ. 3531 (LTS)(HBP), 2014 U.S. Dist. LEXIS 63605 (S.D.N.Y. May 7, 2014) ................................................................................................ 12

BanxCorp. d/b/a BanxQuote v. Costco Wholesale Corp., 09 Civ. 1783(KMK), 2013 U.S. Dist. LEXIS 150258 (S.D.N.Y. Oct. 17, 2013) ................................................................................................ 13

Disney Enters., Inc. v. Hotfile Corp., 11 Civ. 220427, 2013 U.S. Dist. LEXIS 172339 (S.D. Fla. 2013).... 22

Graham v. James, 144 F.3d 229 (2d Cir. 1998) ................................................................................. 17

In re Aimster Copyright Litig., 334 F.3d 643 (7th Cir. 2003) ........................................................... 26

Ling-Rong Chen v. City of Syracuse, 385 Fed. Appx. 41 (2d Cir. 2010) ...................................... 12

UMG Recordings, Inc. v. Veoh Networks Inc., 665 F. Supp. 2d 1099 (C.D. Cal. 2009) ...................... 25, 29

USAR Sys., Inc. v. Brain Works, Inc., 887 F. Supp. 84 (S.D.N.Y. 1995) ...................................... 18

Viacom Int'l, Inc. v. YouTube, Inc., 718 F. Supp. 2d 514 (S.D.N.Y. 2010).................................... 20

Visiting Nurse Assoc. v. Thompson, 378 F. Supp. 2d 75, 78 (E.D.N.Y. 2004) ................................ 2

Wegener v. Johnson, 527 F.3d 687 (8th Cir. 2008) .......................................................................... 12

**Statutes**

17 U.S.C. § 512.................................................................................................................................. 18, 20

17 U.S.C. §§ 106(6), 114-115 ............................................................................................................ 18

**Rules**

Fed. R. Civ. P. 26(a)(2)..................................................................................................................... 7, 10

Fed. R. Civ. P. 72(b) .......................................................................................................................... 7

**Treatises**

8A Wright & Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2010) ................................ 13

Defendant Escape Media Group, Inc. ("Escape"), submits these Objections to the Report and Recommendation of Magistrate Judge Sarah Netburn dated May 28, 2014 (Doc. # 90) (the "Report"), recommending that this Court grant (in substantial part) the Motion for Summary Judgment of plaintiff Capitol Records, LLC d/b/a EMI Music North America ("EMI") (Doc # 71) (the "Motion").

### Preliminary Statement

Judge Netburn's Report, while certainly detailed on the issues that it chooses to address, nonetheless contains self-contradictory findings and erroneous factual assumptions and disregards plainly probative evidence.  Tellingly, these defects and inconsistencies uniformly favor the moving party, EMI, and act to the detriment of defendant Escape.  For example, as discussed in more detail below (at Pt. I), Judge Netburn's evidentiary rulings are internally inconsistent and highly inequitable, refusing to exclude expert evidence disclosed by EMI for the first time as late as its opening submissions in support of the Motion, but precluding Escape's employee declaration offered in rebuttal to that belated expert evidence. In addition, Judge Netburn erroneously rejects - - in a single, perfunctory sentence - - Escape's well-founded arguments seeking to preclude EMI from pursuing claims arising from conduct predating EMI's termination of the parties' Distribution Agreement in March of 2012.  (See infra Pt. II.)  Finally, addressing the central substantive issue of Escape's entitlement to the "safe harbor" afforded to internet service providers under the Digital Millennium Copyright Act (the "DMCA"), Judge Netburn makes incorrect factual assumptions, misinterprets statutory language, ignores disputed facts and attempts to impose upon Escape burdens - - such as filtering or affirmatively monitoring its Grooveshark music streaming service for infringement by its users - - that plainly exceed the DMCA's requirements for "safe harbor" from copyright infringement claims.  (See infra Pt. III.)  For the reasons set forth below, the Court should reject the recommendations of the Report, deny EMI's Motion and permit this matter, including Escape's DMCA defense, to proceed to trial.[1]

---

[1] Because Judge Netburn finds against Escape on one issue concerning the viability of Escape's DMCA defense, she explicitly declines to address certain additional arguments raised in the Motion against that defense. (Report at 79.) Escape respectfully directs the Court to its opposition papers addressing those issues (Opp'n Mem. at 23-35), which it submits should

**Argument**[2]

This Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(2); see also Visiting Nurse Assoc. v. Thompson, 378 F. Supp. 2d 75, 78 (E.D.N.Y. 2004) ("reviewing *de novo* the facts and conclusions of law adopted" by the magistrate judge).

## I.  The Magistrate Judge Erred in Her Evidentiary Rulings.

In the Report, Judge Netburn makes three evidentiary rulings that significantly affect her substantive decision on the Motion. Judge Netburn permits EMI's expert witness, Ellis Horowitz, to testify concerning two belatedly disclosed topics central to EMI's claims: (1) an analysis of Escape's audio files produced in discovery that was conducted by Audible Magic, a company that creates and employs proprietary content recognition software, through which EMI identifies the sound recordings at issue; and (2) Horowitz's statistical analyses of the data produced by Escape in discovery. In contrast to those rulings, Judge Netburn excludes the testimony of Cole Kowalski, an Escape employee who offered a declaration based upon his knowledge of Escape's data in rebuttal to Horowitz's testimony, including facts asserted by Horowitz for the first time in connection with the Motion. The contradiction in these rulings is not merely superficial: as discussed below, Judge Netburn makes inconsistent and erroneous rulings, favoring EMI, concerning the "prejudice" to each party resulting from late witness disclosures. For the reasons set forth below, this Court should reject Judge Netburn's evidentiary conclusions, and should exclude the late-disclosed portions of the Horowitz Declaration, while admitting and considering the Kowalski Declaration.

---

lead to the denial of the Motion on those grounds, and Escape will promptly comply with any request that the Court may have for additional submissions or oral argument on such matters.

[2] Escape respectfully refers the Court to its memorandum in opposition to the Motion, and accompanying declarations, filed before Judge Netburn, for a recitation of the relevant factual background. (See Doc. # 77-81.)

A.    **Audible Magic**

Judge Netburn should have excluded the conclusions of Audible Magic, which conducted an expert technical analysis for EMI, but whose opinions were never disclosed by EMI in advance of its opening Motion papers, where they were included for the first time as hearsay in the Horowitz Declaration. As set forth in more detail in Escape's opposition papers (at 8), the Audible Magic analysis provides EMI's sole basis for identifying audio files uploaded to Grooveshark and produced by Escape in discovery ("MP3" files) as particular sound recordings purportedly owned by EMI. (See also Horowitz Decl. ¶¶ 77-79.) Through the Audible Magic analysis, EMI identified for the first time in connection with its Motion the works at issue in this action. EMI never even suggested prior to filing of its Motion that Audible Magic would be used to determine this central element of its claims - - let alone providing proper expert disclosures under Fed. R. Civ. P. 26(a)(2) - - and Horowitz's expert report did not include any mention of Audible Magic. (Giger Decl. ¶ 7.) Instead, the Horowitz Declaration submitted in connection with the Motion offers a vague description of the Audible Magic analysis and what appears to be manually prepared charts connecting the "File IDs" of audio files on Grooveshark with particular EMI recordings allegedly determined by Audible Magic to be embodied on those files. As discussed below, Escape was clearly prejudiced by EMI's failure to disclose the Audible Magic analysis in discovery, and Judge Netburn erred in failing to recommend exclusion of that evidence.

(i)    *EMI Indisputably Violated Rule 26(a)(2).*

Judge Netburn's consideration of Horowitz's Declaration testimony concerning Audible Magic's analysis assumes facts not in evidence, ignores contrary evidence and fails to address inescapable alternative grounds for excluding that testimony. First, Judge Netburn assumes, without evidence, that Horowitz himself conducted the analysis and merely used Audible Magic's software to do so. (Report at 12-14.) There is no evidence of this in the record. In fact, Horowitz conspicuously avoids stating as such in his Declaration, writing that "[t]he recordings embodied in these MP3s *were identified* using the industry-leading 'Copysense' content recognition software" owned and employed by Audible Magic.

3

(Horowitz Decl. ¶ 78 (emphasis added).)  In Reply, with full knowledge of Escape's argument to exclude Audible Magic's analysis, Horowitz never stated that he, rather than Audible Magic, conducted the analysis; in fact, he failed to even proffer a reply declaration.  Instead, EMI offered mere lawyer argument that an expert may employ software "without finding the software manufacturer to be an expert witness." (Reply Mem. at 21.)  But that argument is misleading, as it assumes evidence that EMI never adduced – – *i.e.*, that Horowitz, rather than Audible Magic, conducted the analysis.[3]

In fact, Escape demonstrated at oral argument that Audible Magic is not, as EMI argued, simply a "software manufacturer"; it is a company that uses its proprietary software and its employees to perform technical analyses for clients, such as EMI.  Counsel for Escape presented evidence of this fact at oral argument on the Motion, *i.e.,* a declaration from an Audible Magic employee named Vance Ikezoye submitted in a case pending in this Court against Escape brought, *inter alia*, by EMI's parent company, UMG Recordings, Inc.  (See Decl. of Matthew H. Giger in Support of Def's Objections ("Giger Obj. Decl.") ¶ 2 & Ex. A.)  Mr. Ikezoye's Declaration makes clear that Audible Magic, not Horowitz (who is also the plaintiffs' expert in the UMG action), conducted the analysis using its proprietary software and prepared resulting reports.  (Id.)  Thus, the only evidence on the issue supports Escape's assertion that Audible Magic did, in fact, conduct the expert analysis and reach the conclusions vaguely reported for the first time in the Horowitz Declaration.  EMI's failure to disclose Audible Magic as an expert witness is a clear violation of Fed. R. Civ. P. 26(a)(2).[4]

---

[3] In the absence of such evidence, Judge Netburn relies upon quotations from the Audible Magic website and case decisions describing how the Audible Magic software can be used, or has been used in the past, to identify sound recordings and filter content on internet sites.  (Report at 13-14.)  But these materials do not demonstrate how Audible Magic was used in *this* case, or whether Horowitz or Audible Magic itself conducted the analysis.

[4] This Court should also reject Judge Netburn's notion that requiring disclosure of Audible Magic as an expert would be like requiring an "executive of calculator companies" to be subject to expert depositions.  (Report at 14.)  Audible Magic's software, and the associated process of identifying sound recordings, is the *sole basis* for EMI's identification of the works at issue in this case, a critical component of its copyright infringement claims.  That software is not some sort of generally accepted tool, like a calculator, employed by Horowitz through use of his expertise to reach a conclusion; Audible Magic is *itself* determining a critical issue of fact through a process that has been successfully obscured by EMI from Escape and the Court.

Second, even if one assumes *arguendo* that Audible Magic did not act as an undisclosed expert witness, EMI still indisputably breached its disclosure obligations under Rule 26(a)(2), as Horowitz disclosed the Audible Magic results - - entirely absent from his expert report - - for the first time in his summary judgment Declaration. Thus, regardless of whether Audible Magic should have been separately disclosed under Fed. R. Civ. P. 26(a)(2) (Escape submits it should have been), EMI's disclosure of the Audible Magic analysis through Horowitz is still prejudicially late and in violation of Rule 26(a)(2).

Judge Netburn failed to recognize or address this fact in the Report, despite Escape's argument of the point. (Opp'n Mem. at 9-12.) Instead, she reasoned that Audible Magic's analysis can be considered "within the permissible scope of research and data collection done by third-party assistants to experts" and states that Horowitz's reliance on "hearsay evidence from Audible Magic . . . would be likely permissible" under Federal Rule of Evidence 702. (Report at 15.) This misses the point. Even if Horowitz could validly provide hearsay testimony concerning the Audible Magic analysis, that entire area of testimony was not disclosed during discovery, in violation of Rule 26(a)(2) and to the significant prejudice of Escape.

### (ii)   *Judge Netburn Erred in Finding that Escape Was Not Prejudiced by EMI's Late Disclosure of the Audible Magic Analysis.*

Despite Escape's inability to depose either Audible Magic or Horowitz concerning the Audible Magic analysis, or otherwise test the validity of that analysis during discovery, the Report finds that Escape was not prejudiced by EMI's late disclosure because Escape purportedly "possesses substantial information that would allow it to determine whether the Audible Magic analyses were reliable," but "does not claim that a single MP3 file is incorrectly identified as an EMI work." (Report at 16.) Judge Netburn does not identify what this "substantial information" consists of, other by vague reference to Escape's "own music library and data." (Id.) This conclusion is erroneous for at least two reasons.

First, Escape has no obligation to conduct an emergency rebuttal analysis concerning the identity of over 13,000 audio files during summary judgment briefing because EMI chose not to disclose the Audible Magic conclusions prior to the filing of its Motion. The undue prejudice of requiring a party to

scramble to somehow respond to late disclosed expert analyses during summary judgment briefing is precisely why Rule 26(a)(2)'s disclosure obligations exist in the first instance. It is always the case that a party may theoretically be capable of providing a rebuttal to expert testimony improperly disclosed for the first time in a summary judgment declaration. If the disclosure obligations in Rule 26 mean anything, they mean that a party is not compelled to do so to rectify its adversary's discovery defalcation.

Second, Judge Netburn lacked evidence to conclude that Escape could rebut the Audible Magic's analysis internally through the use of its own data, but instead appears to assume that fact based upon Escape's maintenance of "fingerprints" of the EMI master recordings delivered to Escape under the parties' Distribution Agreement. (Report at 36.) But there was no evidence introduced concerning the process by which Escape might use those fingerprints to identify the sound recordings embodied in the works at issue, or even whether that would be practicable within the time frame of the parties' summary judgment briefing, while Escape was engaged in preparing its response to the Motion. Thus, even if Escape could reasonably be required to attempt to conduct its own rebuttal to Audible Magic's late-disclosed analysis during summary judgment briefing, Judge Netburn had no evidentiary basis to conclude that this was possible.[5]

In short, EMI's failure to disclose the Audible Magic analysis prior to the Horowitz Declaration on summary judgment was a clear breach of Fed. R. Civ. P. 26(a)(2), which caused prejudice to Escape. Thus, the Court should exclude Audible Magic's conclusions and deny the Motion on this basis alone.

### B.   Horowitz Data Analyses

In addition to the Audible Magic analysis, the Horowitz Declaration includes several statistical analyses of Escape's data that were not disclosed in Horowitz's expert report. As Judge Netburn finds in the Report, it is undisputed that Horowitz's expert report was not "detailed and complete," as required by

---

[5] Although it is not an explicit component of Judge Netburn's rationale declining to exclude the Audible Magic analysis, the Report elsewhere notes that Escape produced its "Files" table - - the "complete centralized table Horowitz used to analyze Escape's MP3s" - - on December 4, 2013, after the Horowitz deposition. EMI's attempt to raise the date of this production as an excuse for its late disclosure of the Audible Magic analysis is misleading. (See Semel Reply Decl. ¶ 17.) The complete "Files" table - - which is merely a list of File IDs and related information - - was unnecessary for Audible Magic to conduct its analysis of the MP3s produced by Escape in September 2013. (See Giger Obj. Decl. ¶¶ 18-19 & Ex. L.)

Fed. R. Civ. P. 26(a)(2)(b), because it failed to include these analyses. (Report at 16.) Rather than argue that the same did not violate the rules, EMI claims that its failure to disclose Horowitz's data analyses was "substantially justified or harmless." (Id.) Judge Netburn's rote acceptance of this argument, and concomitant refusal to exclude Horowitz's late-disclosed data analyses, is based on speculative and erroneous findings concerning the manner in which EMI's discovery violations unfolded in this action and the resulting prejudice to Escape. Because EMI's arguments and asserted facts concerning Mr. Horowitz's data analyses appear for the first time in its reply papers, Escape did not have an opportunity until now to fully respond concerning these matters.[6] For the reasons set forth below, the Court should reject Judge Netburn's Report on this issue and should exclude the Horowitz data analyses from evidence in connection with the Motion.

> (i)   *Judge Netburn Erroneously Held that Late Disclosure*
> *of Horowitz's Data Analyses was "Substantially Justified."*

As set forth in detail in Escape's opposition brief (at 21), Horowitz's data analyses fall into three general categories: (1) data queries and results run in connection with his expert report, but discarded and not disclosed; (2) data analyses disclosed for the first time almost a month after service of his expert report and three business days prior to his rescheduled deposition; and (3) data analyses disclosed for the first time in the Horowitz Declaration in support of EMI's Motion. The details of this slow trickle of late disclosure are set forth in Escape's opposition brief, to which Escape respectfully refers the Court. (Opp'n Mem. at 19-22). The Report erroneously finds, based solely upon the Reply Declaration of EMI's counsel, Benjamin Semel, that "most, if not all" of this parade of late disclosure was "substantially justified" due to Escape's production of updated versions of three database tables - - the "SongFiles,"

---

[6] While Judge Netburn finds fault in Escape's failure to seek "leave to file a sur-reply," no such document is provided for in the Federal Rules of Civil Procedure. Clearly, Escape should not be prejudiced as a result of its reluctance to demand such relief. Rather, the Court should permit Escape to present the evidence, set forth below, refuting EMI's assertions made for the first time in reply. See Fed. R. Civ. P. 72(b) (permitting the district judge, *inter alia*, to "receive further evidence" in resolving objections to a magistrate judge's report and recommendation).

"Deleted_SongFiles" and "Files" tables - - "after Horowitz could have possibly included them in his expert report." (Report at 17.)  The Court should reject this conclusion for several reasons.

First, EMI incorrectly asserts in its reply papers that these tables were produced "late" by Escape, and Judge Netburn's acceptance of this assertion is erroneous. (Report at 17.)  As addressed in the Declaration of Matthew H. Giger, submitted herewith, Escape first produced these three tables in September 2013, albeit limited to data dated on or after January 1, 2011 (Giger Obj. Decl. ¶ 4) - - i.e., the period after EMI's "undisputed" release of claims accruing on or before December 31, 2010.  (Report at 41.)  Following certain discovery disputes between the parties concerning the scope of Escape's data production, and Escape's subsequent production of additional data tables to EMI, EMI wrote to Judge Netburn on October 11, 2013 that "the documents appear on their face to address each of the pending discovery matters, and at this time EMI believes it can move ahead under the existing Scheduling Order and submit its expert report by October 25, 2013." (Giger Obj. Decl. ¶¶ 4-5 & Ex. D.)  Subsequently, two days prior to the disclosure of its expert report, EMI requested orally through counsel that Escape update the produced SongsFiles and Deleted_SongsFiles tables without date restriction, and, rather than fight with EMI concerning its entitlement to that data, Escape provided the requested update two days later, the date that EMI served the Horowitz expert report. (Id. ¶ 6 & Ex. E.)  EMI never complained that it lacked sufficient data for Horowitz to prepare his report.  Nonetheless, as discussed above, EMI did not disclose Horowitz's data analyses until November 20, a mere three business days prior to his deposition.  After that late disclosure of data analyses, in response to yet a further request from EMI, Escape produced an updated Files table, without date restriction. (Id. ¶ 7.)  EMI never once raised any issue concerning the disclosure dates of the complete SongsFiles, DeletedSongsFiles and Files tables until Escape asked Judge Netburn to exclude Horowitz's late-disclosed data analyses, which reveals these "excuses" for what they are:  an unfounded tactical position conceived to avoid the consequences of EMI's late disclosures. (Id. ¶ 8.)

Second, even if Escape could somehow be seen to have updated these data tables "late" (and it cannot), there is no evidence - - other than EMI counsel's self-serving assertions - - to support the idea that Escape's updated data was "integral to [Horowitz's] analysis." (Report at 17.)  EMI offers no evidence from Horowitz, or any other source, concerning why it was purportedly "integral" to his analysis to have data from SongsFiles, Deleted_SongsFiles or Files tables predating January 1, 2011.  Instead, EMI relies solely on the meaningless *ipse dixit* by EMI's counsel, Benjamin Semel, that Horowitz's data analysis "follows upon" Escape's purportedly "delayed production of data" from these files.  (Semel Reply Decl. ¶¶ 17, 19.)  Mr. Semel does not describe in any fashion how the supposed "delayed production" was used by Horowitz, if at all.  Indeed, a review of the data "queries" run by Horowitz reveals that, of the 12 data queries identified by Horowitz in connection with his Declaration (Horowitz Decl. Exs. 7-11), only *two queries* accessed data from any of these three tables (id. Ex. 7 (Query 1) & Ex. 9), and it is not clear - - because Horowitz does not say - - whether those queries relied on any data from those tables pre-dating January 1, 2011 - - *i.e.*, the supposedly "late"-disclosed data.

In short, EMI's excuse for late disclosure of Horowitz's data analyses is contrived, and there was no basis for Judge Netburn to determine that Escape's disclosure of updated SongsFiles, Deleted_SongsFiles and Files database tables was somehow "integral" to those analyses and thus excused their late disclosures.

### (ii)     Judge Netburn Erroneously Found that
### Late Disclosure of Horowitz's Data Analyses was "Harmless."

Judge Netburn also held that the admittedly late disclosure of Horowitz's data and statistical analyses was "harmless," because:  (1) they were "derived from Escape's own data"; (2) "many of Horowitz's findings" (but not all) "were produced to Escape before Horowitz's deposition" and Escape "had the opportunity to question Horowitz about his findings"; and (3) Escape did not request leave "to further depose Horowitz" concerning data analyses "produced after his deposition" - - *i.e.,* those included for the first time in the Horowitz Declaration submitted with the Motion.  (Report at 18.)  In short, Judge

Netburn holds that, because it might somehow have been hypothetically *possible* for Escape to respond to the late disclosed Horowitz data, EMI's violation of the rules was harmless. This holding was erroneous.

Escape's possible theoretical ability to rebut Horowitz's expert opinions through internal testing and analysis of its own data does not render EMI's late disclosures "harmless." There is nothing unique about the fact that Horowitz's conclusions were based upon Escape's "own data": expert testimony is always based upon evidence available to both parties in discovery. See, e.g., Fed. R. Civ. P. 26(a)(2) (requiring disclosure, *inter alia*, of "the facts or data considered by the [expert] witness" in forming his opinions). If that circumstance alone were sufficient to make late disclosure "harmless," the disclosure deadlines of Rule 26 would be rendered illusory. As such, the mere possibility of formulating a rebuttal to late-disclosed expert testimony cannot be considered probative of the harm to the opposing party. Rather, the "harm" determination properly should be rooted in an examination of what actually transpired in discovery.

Here, Escape was indisputably harmed by EMI's late disclosure. Judge Netburn failed to recognize that Escape lost the opportunity to present rebuttal expert testimony as a result of EMI's "bait and switch" with the Horowitz expert report. Only weeks *after* Escape's deadline for disclosure of rebuttal experts, and three business days prior to Horowitz's rescheduled deposition, did EMI suddenly disclose numerous technical data queries and analyses. Under those circumstances, the fact, cited by Judge Netburn, that "many" (but not all) of Horowitz's findings were disclosed a few days prior to his deposition does not ameliorate the harm to Escape. A review of the Horowitz deposition transcript reveals that the deposition necessarily focused upon Horowitz's general processes and procedures rather than his substantive conclusions or particular data queries. (Giger Obj. Decl. ¶ 12.) Escape was prejudiced by its counsel's inability to fully address the substance of Horowitz's data analyses. Moreover, the prejudice to Escape is even more apparent from Horowitz's testimony set forth for the first time in his summary judgment Declaration. (See Horowitz Decl. ¶¶ 70, 74, 75, 81.) It would set a dangerous precedent to accept Judge Netburn's notion that a party waives its entitlement to timely

10

disclosure by failing to demand supplemental discovery, including expert depositions, *during* the summary judgment briefing schedule. Indeed, it would provide disclosing parties such as EMI with an unfair tactical advantage, encouraging them to withhold expert disclosures until the filing of summary judgment, thereby burdening the answering party not only with responding to the motion, but with conducting substantive discovery on previously undisclosed expert opinions.

In short, Judge Netburn placed far too great a burden on Escape to minimize the inexorable harm caused by EMI's late disclosures. Escape should not be forced to forgo an expert witness, scramble in three days to prepare for a technical expert deposition on newly disclosed analyses and then conduct a supplemental deposition in the middle of summary judgment briefing as a result of EMI's admitted violations of the disclosure rules. Rather, Horowitz's late-disclosed opinions should be precluded by this Court.

## C.   Kowalski Declaration

Remarkably, while Judge Netburn finds EMI's rule violations to be harmless, she paradoxically excludes the entire Kowalski Declaration, offered by Escape in response to Horowitz's late-disclosed testimony, reasoning that EMI was "prejudiced" by Escape's failure to formally disclose Mr. Kowalski as a witness during discovery. This determination is not only self-contradictory and inequitable, it is erroneous. As discussed below, EMI was fully aware through discovery that Mr. Kowalski was a potential witness with relevant knowledge, and Escape thus had no obligation to formally supplement its initial disclosures to add Mr. Kowalski. Moreover, even if formal disclosure of Mr. Kowalski was required (and it was not), EMI had at least as much opportunity to respond to the Kowalski Declaration as Escape did to the Horowitz opinions initially disclosed in his summary judgment Declaration, revealing the clear error in Judge Netburn's contradictory decision that EMI was prejudiced, but Escape was not. Thus, the Court should reject Judge Netburn's exclusion of the Kowalski Declaration.

*(i) Escape's Failure to Formally Disclose Kowalski
as a Witness Was Not a Violation of Rule 26(a)(1).*

As Judge Netburn noted, the Kowalski Declaration was provided by Escape "to dispute many of EMI's proposed facts, particularly ones salient to Escape's DMCA defense." (Report at 22-23.) Many of EMI's proposed facts to which the Kowalski Declaration responds are the late-disclosed opinions of Horowitz, some of which appear for the first time in the Horowitz Declaration filed in connection with the Motion. (See Report at 27 (noting that Kowalski's testimony is "intended specifically to pit his calculations and analyses against those of Horowitz")). For example, Kowalski examined the upload date for the audio files at issue, identified for the *first time* in the Horowitz Declaration, in support of Escape's argument that EMI had previously released its claims based upon certain of those uploaded files. (Kowalski Decl. ¶¶ 7, 8.) Similarly, Kowalski testified based upon his knowledge and personal investigation of Escape's database to rebut Horowitz's assertion that Escape did not process any DMCA notifications from content owners for a 16-month period. (Id. ¶¶ 9-13.) Given EMI's late disclosure of Horowitz's opinions, Escape should have been permitted to respond by offering testimony from the Escape employee with relevant first-hand knowledge, *i.e.*, Mr. Kowalski.

Because much of Kowalski's testimony is directly responsive to Horowitz, it should be considered "impeachment" testimony, which need not be disclosed under Rule 26. See Fed. R. Civ. P. 26(a)(1) (disclosure not required of evidence used "solely for impeachment" purposes). It is well established that impeachment, defined as an "attack on the credibility of a witness," can occur by factual contradiction, as when the credibility of a witness is attacked "by the presentation of evidence showing that facts asserted or relied upon in their testimony are false." Advanced Analytics, Inc. v. Citigroup Global Markets, Inc., 04 Civ. 3531 (LTS)(HBP), 2014 U.S. Dist. LEXIS 63605, at *9 (S.D.N.Y. May 7, 2014) (quoting Wegener v. Johnson, 527 F.3d 687 (8th Cir. 2008)); see also Ling-Rong Chen v. City of Syracuse, 385 Fed. Appx. 41, 42 (2d Cir. 2010) (permitting undisclosed witness to testify for "purpose of impeaching" the plaintiff's fact testimony about the "incident" at issue).

12

In addition, even if portions of the Kowalski Declaration cannot, strictly speaking, be considered "impeachment" of the Horowitz Declaration, Escape had no obligation to formally disclose Kowalski because EMI was well aware of his role as a potential witness through depositions of other Escape employees. Supplementation of Rule 26(a)(1) initial disclosures to identify knowledgeable witnesses is "only necessary when the omitted or after-acquired information has not otherwise been made known to the other parties during the discovery process." BanxCorp. d/b/a BanxQuote v. Costco Wholesale Corp., 09 Civ. 1783(KMK), 2013 U.S. Dist. LEXIS 150258, at *111 (S.D.N.Y. Oct. 17, 2013) (quoting 8A Wright & Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2010)). As a result, there is "no need as a matter of form to submit a supplemental disclosure to include information already revealed by a witness in a deposition." Id. As the Court found in BanxCorp., EMI "had these witnesses names and roles, and it could have easily deposed them if it chose to." Id. at *112.

As Escape noted at oral argument, Mr. Kowalski's "name and his position and his role came up repeatedly at depositions . . . So he's not someone that EMI didn't know existed." (Giger Obj. Decl. Ex. G (Apr. 29, 2014 Tr. 32:22-24.)) EMI's counsel, however, attempted to downplay the references to Mr. Kowalski at deposition, characterizing them to Judge Netburn as limited to testimony such as, "these are the people that work under me, so-and-so, so-and-so and Cole Kowalski as well. He was never identified in any of the discovery." (Id. at 9:16-18.) In fact, Mr. Kowalski is referenced a total of 14 times within the deposition transcripts of Colin Hostert and Josh Greenberg, including 13 references in Mr. Hostert's deposition transcript alone, spanning 154 pages of testimony. (Giger Obj. Decl. ¶ 16 & Exs. H & I.) Mr. Kowalski was referred to so frequently that EMI's counsel, conducting the deposition, began referring to him after a certain point in the deposition solely by his first name, "Cole." (Id. Ex. H.) Importantly, Mr. Kowalski was not merely referenced in passing during these depositions; rather, he was identified by Mr. Hostert as the Escape employee who specifically undertook relevant data analyses in response to issues

raised by EMI, some of which, not surprisingly, were included in the Kowalski Declaration.  (Giger Obj. Decl. ¶ 16.)[7]

For the foregoing reasons, Judge Netburn erred in finding that Escape violated Rule 26(a)(1) by failing to formally disclose Kowalski in supplemental disclosures or otherwise in discovery.

(ii)     *The Court Erred in Finding that EMI was Prejudiced*
*by Escape's Failure to Formally Disclose Mr. Kowalski.*

In any event, even if Escape had failed to properly disclose Kowalski (and it did not), Judge Netburn's determination that EMI suffered resulting prejudice is erroneous, and directly contradictory to her ruling that EMI's late disclosure of Horowitz's opinions was "harmless."  Judge Netburn ruled that EMI would be "substantially prejudiced" by the Kowalski Declaration because it "did not have the opportunity to depose Kowalski or to address his testimony in its opening summary [judgment] motion papers."  (Report at 23.)  Instructively, Judge Netburn held that Escape should have requested Horowitz's deposition on his newly disclosed opinions while preparing its opposition to the Motion, but ruled that EMI could not have sought a similar "opportunity" to depose Kowalski on his limited rebuttal testimony in advance of its reply.  Judge Netburn clearly holds EMI to a different standard than Escape - - not only on this issue, but throughout her Report.

Regardless of whether EMI should have taken Kowalski's deposition, EMI was not prejudiced by having to respond to Kowalski's testimony in its Reply.  The Kowalski Declaration is based upon the data produced in discovery - - *i.e.*, the same exact data that EMI has and that its expert, Horowitz examined to reach his conclusions.  The Report's reliance on the laudable goal of Rule 37(c)(1) to prevent "'sandbagging' the opposing party with new evidence" (Report at 24) is therefore misplaced - - Kowalski's Declaration does not rest upon "new evidence" (nor was Kowalski unknown to EMI, as discussed above).  Rather, Kowalski examined Escape's data (the same data in EMI's possession), with

---

[7] Mr. Kowalski is also referenced in the transcripts of Messrs. Hostert's and Greenberg's depositions in the pending Southern District of New York action *Arista Music, et al. v. Escape Media Group, Inc., et al.*, No. 11 Civ. 8407, which were also produced to EMI in this action.  Importantly, Mr. Kowalski was repeatedly identified in those transcripts as someone

which he is familiar through his work on a daily basis at Escape, and offered his testimony based upon his first-hand experience and knowledge as an Escape employee.  Contrary to Judge Netburn's finding, Kowalski is not an expert giving an "opinion"; rather he is akin to a corporate controller submitting an affidavit stating the profits and losses of the corporation over a specified period based on the company's accounting data.  Here, Kowalski has responsibility for Escape's data maintenance and processing, and he simply offered testimony concerning what that data shows.  (See Kowalski Decl. ¶¶ 2, 3.)

Given that it possessed the same data consulted by Kowalski, EMI had the ability to, and did, respond in detail to his Declaration on reply.  While EMI should have offered that response through Horowitz, its expert witness, it instead chose to attack the Kowalski Declaration through the improper reply declaration of Benjamin Semel, counsel for EMI.  (Semel Reply Decl. ¶¶ 22-37.)[8]  In any event, EMI was not prejudiced by Escape's inclusion of the Kowalski Declaration in its opposition papers in rebuttal to Horowitz's testimony - - EMI had a full opportunity to respond to the same - - and for this reason, in addition to its long-standing knowledge of Kowalski through deposition testimony, the Court should reject Judge Netburn's recommendation to exclude the Kowalski Declaration from consideration in connection with the Motion.[9]

---

whom Messrs. Hostert and Greenberg relied upon to investigate and make determinations about Grooveshark data and technical functions.  (See, e.g., Giger Obj. Decl. ¶ 17 & Exs. J & K)

[8] Mr. Semel argues, inter alia, (1) that Kowalski's employment description indicates that he lacks first-hand knowledge of the matters about which he testifies (id. ¶ 25); (2) that Kowalski's testimony lacks "explanation, exhibit or database query that could be used to verify his claims (id. ¶¶ 26, 33); and (3) that Kowalski's testimony is "counterintuitive and unreasonable" in light of Mr. Semel's interpretation of what Escape's database tables record and what the data means (id. ¶¶ 27-32).  These arguments are unavailing.  First, Kowalski identifies himself as an employee with responsibility for database "schema" who has acquired over 31 months of employment familiarity with "Escape's databases, their structure and the information they contain." (Kowalski Decl. ¶¶ 2-3.)  Mr. Semel's assertion that Kowalski has no basis to testify concerning "what the data means on Escape's servers" is unfounded.  (Semel Reply Decl. ¶ 25.)  Second, Kowalski identifies how he reached his conclusions, referring to the database tables examined - - e.g., the "DeletedFiles," "DeletedUserFiles," and "Users" tables - - data that EMI itself has received through discovery.  (Kowalski Decl. ¶¶ 4, 6, 9-11.)  Third, and perhaps most importantly, Mr. Semel's substantive arguments concerning Kowalski's testimony, at best, raise issues of fact (See Semel Reply Decl. ¶¶ 27-29) and, at worst, consist of improper attorney argument which is not "evidence" appropriate for a declaration, but should have been included in EMI's legal memoranda (See id. ¶¶ 29-30).  In any event, it is clear that EMI was equipped to, and did, provide a detailed response to the Kowalski Declaration.

[9] As an alternative basis to exclude Kowalski's testimony, Judge Netburn also reasons that exclusion of the Kowalski Declaration is necessary to "prevent Escape from circumventing . . . the 'sham affidavit rule'" by introducing testimony through Mr. Kowalski that contradicts testimony of other Escape witnesses who were deposed.  (Report at 24.)  But Judge Netburn has not identified any testimony of Mr. Kowalski that is contradicted by other Escape witnesses, at most offering that Mr. Kowalski's testimony is "not corroborated" by the depositions of other Escape employees.  (Id. at 25.)  This lack of

## II.     The Magistrate Judge's Decision Concerning EMI's Release of Claims was Erroneous.

In its opposition papers, Escape argued that EMI released and is thus barred from pursuing copyright infringement claims for uploading and streaming of audio files on Grooveshark prior to the termination of the Distribution Agreement on March 22, 2012. (Opp'n Mem. at 12-14.) Kowalski testified that "at least 4,888 audio files identified by EMI" as part of the works at issue were uploaded to Grooveshark prior to that termination date. (Id. at 12; Kowalski Decl. ¶ 8.) Judge Netburn devotes a single ambiguous sentence to this issue, stating - - without citation to evidence or further explanation - - that Escape's argument is "unavailing" because "the undisputed evidence establishes that EMI released Escape as to claims for infringement that accrued before or on December 31, 2010." (Report at 41.) The Report, however, does not address the consequence of this holding with respect to EMI's claims for audio files uploaded prior to December 31, 2010, of which there are 2,019. (See Kowalski Decl. ¶ 8.) In any event, Judge Netburn's temporal limitation of the scope of EMI's claims to post-January 1, 2011 is erroneous, and, for the reasons set forth below, this Court should modify the Report to hold that EMI may only pursue infringement claims for uploads and streams occurring after the termination of the Distribution Agreement on March 22, 2012.

EMI's infringement claims based upon uploads or streams that occurred prior to termination of the Distribution Agreement on March 22, 2012 are barred by the parties' agreement, as amended. (See Opp'n Mem. at 13-14.) It is axiomatic that, during the term of the parties' Distribution Agreement, their legal relationship, including their rights and obligations in respect of any EMI sound recordings uploaded by Grooveshark users, was governed by that Agreement. In this regard, the First Amendment to the Distribution Agreement established certain contractual obligations of Escape to filter out and prevent exploitation of user-uploaded EMI recordings on Grooveshark. (Id. at 13; Tarantino Decl., Ex. D. at ¶ 7.) Importantly, in the event Escape failed to "substantially comply" with those obligations, EMI was

---

"corroboration" is not surprising, as Mr. Kowalski's testimony was offered by Escape to address and respond to the belatedly disclosed testimony of Horowitz, disclosed by Escape well after the close of fact discovery.

required to provide notice of breach and an opportunity to cure. (Id.) But EMI never noticed any breach of those obligations, did not terminate the Distribution Agreement on the basis of any such breach and, as a result, does not (and could not) assert breach of contract claims in this action based upon Escape's alleged exploitation of user-uploaded EMI recordings during the term of the Distribution Agreement.

Because EMI cannot claim breach of contract for pre-termination user uploads, EMI's infringement claims are limited to uploads and streams of EMI recordings that occurred after its March 22, 2012 termination of the Distribution Agreement. In fact, EMI acknowledged this fact when it wrote in the March 22 termination letter, as referenced by the Report, that "any *further* exploitation of EMI Content is infringing and breaches" the parties' agreements and such "*further* exploitation" may "subject Grooveshark to substantial penalties under federal statutory law." (Tarantino Dec. Ex. E, at 2; Report at 36.) This language confirms EMI's contemporaneous understanding that, as it had not given notice and provided an opportunity to cure any purported breaches resulting from Grooveshark's exploitation of user-uploaded EMI recordings during the term of the Agreement, its infringement claims were prospective only. As a result of this understanding, EMI explicitly restricted its claims for violation of the right of "public performance" to "streams after March 22, 2012." (Reply Mem. at 5; Horowitz Decl., Exs. 12, 13.) But EMI nonetheless appears to continue to press claims for copyright infringement based upon uploads of audio files to Grooveshark prior to March 22, 2012. This Court should reject such claims as a matter of law, as EMI did not comply with the notice and cure provisions necessary to assert a breach of the Distribution Agreement based upon such uploads and, thus, cannot pursue claims for copyright infringement, which would require EMI first to demonstrate conduct in breach of that Agreement. See, e.g., Graham v. James, 144 F.3d 229, 237 (2d Cir. 1998) ("A material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work

thereafter."); <u>USAR Sys., Inc. v. Brain Works, Inc.</u>, 887 F. Supp. 84, 85 (S.D.N.Y. 1995) (finding copyright infringement claims "only incidental" to breach of contract claim).[10]

### III.   The Magistrate Judge Erred in Finding that Escape is Not Entitled to the DMCA Safe Harbor as a Matter of Law.

Perhaps because Judge Netburn recognized the myriad factual issues concerning EMI's other asserted bases to overcome Escape's DMCA defense, the Report rests its determination concerning the safe harbor upon a single statutory requirement:  that an internet service provider have "adopted and reasonably implemented, and informs subscribers and account holders . . . of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders . . . who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).  Judge Netburn held that Escape has not satisfied this condition of safe harbor eligibility as a matter of law.  For the reasons set forth below, that holding was erroneous.

Judge Netburn correctly held that Escape (1) has adopted a formal policy for the termination of access to Grooveshark by repeat infringers and (2) informs its users of that policy.  (Report at 55-57.)  As a result, her decision on Escape's DMCA defense turns solely on whether Escape "implemented" its repeat infringement policy and whether that implementation was "reasonable."  The Report finds that Escape has not "implemented" its repeat infringer policy and, even if it had, that implementation was "unreasonable" as a matter of law.  (Report at 57-79.)  Both of these determinations are erroneous.[11]

---

[10] EMI claims that Escape "fails to raise an issue of fact" concerning "*which files* were allegedly uploaded prior to 2011." (<u>Id.</u> (emphasis in original).)  It is not necessary to specify at this time when particular files have been uploaded, as both Escape and EMI possess the data from which the upload dates of particular files may be determined.  In his Declaration (at ¶ 8), Kowalski summarized Escape's data concerning files uploaded during particular time periods.  For present purposes, the Court should determine that EMI may only pursue infringement claims for "copying" based upon uploads to Grooveshark occurring after March 22, 2012, leaving for a later date any necessary determination of which particular files satisfy that legal criterion.

[11] In holding generally that state common law copyright infringement claims "mirror" federal claims, Judge Netburn also overlooked an important distinction between federal and New York law concerning "public performance" rights in sound recordings.  In short, New York state law has never recognized a right of public performance in sound recordings.  Not surprisingly, neither EMI nor Judge Netburn cited a case finding such a right under New York law.  Significantly, federal copyright law has long excluded sound recordings as a class from any "public performance" right under the Copyright Act, a circumstance which was only slightly modified more recently by the Digital Performance Right in Sound Recordings Act of 1995, which imposed a limited, multi-tiered performance right for sound recordings in the context of digital transmissions.  <u>See</u> 17 U.S.C. §§ 106(6), 114-115.  This complicated federal statutory scheme has not been imported into New York common law.  As a result, and further in light of Judge Netburn's finding that EMI has not proved direct infringement by copying (Report at 44-46), EMI's state-law claims should be limited to claims of secondary liability for user "copying" of recordings by uploading them to the Grooveshark service.

**A. Escape "Implemented" Its Repeat Infringer Policy or, at a Minimum, a Factual Issue Existed on The Issue**

As Judge Netburn noted, the "relevant repeat infringer policy" at issue is Escape's "one strike policy," by which it disables the upload capabilities of an account holder upon receipt of the first DMCA notice directed at an audio file uploaded by that user. (Report at 58; see also Tarantino Decl. ¶ 19; Hostert Decl. ¶¶ 24-29 (describing the "one strike" policy.)) Because Escape terminates an accountholder's uploading capability after only one DMCA notice, Escape's "one strike" policy is designed to be more strict than the "repeat infringer" policy required by the DMCA. As set forth in the Kowalski Declaration, erroneously excluded by Judge Netburn, Escape has "barred the uploading privileges of more than 38,900 Grooveshark accountholders" through the implementation of its "one strike" policy. (Kowalski Decl. ¶ 6.) Despite this evidence, Judge Netburn erroneously held that Escape "does not 'implement' its repeat infringer policy within the meaning of the DMCA." (Report at 73.)

### *i.* *Escape's Policy "Terminates" Accounts Sufficiently for DMCA Purposes.*

Addressing a threshold issue, Judge Netburn incorrectly found that Escape does not "terminate" repeat infringers for DMCA purposes. As part of its "one strike" policy, Escape disables account holders' upload privileges in response to DMCA notifications, but does not delete all data or audio files associated with their account or bar them from signing in to simply and passively use the Grooveshark website, as any individual can do. (Hostert Decl. ¶¶ 24-29.) But, as Escape noted in its opposition papers, Judge Netburn's distinction between "termination" of an account and "barring uploads" from that account is a "distinction without a difference" for DMCA purposes and fails to serve the goals of the statute. The *only* Grooveshark accountholder privilege that allows a user to add a copy of an audio file to Grooveshark - - and therefore, the *only* one that can be misused by users to infringe copyright - - is the uploading of audio files. (Tarantino Decl. ¶¶ 5-6.) The remaining account privileges merely permit users to associate or disassociate their account from content that *already exists* on Grooveshark. Thus, Escape's practice of disabling upload capability after the first instance of a DMCA notice plainly serves the statute's purpose of preventing "repeat infringement" by Grooveshark account holders.

Judge Netburn's finding that disabling uploading is not equivalent to "termination" under the DMCA rests upon her (1) reference to certain court decisions that refer in passing to the termination requirement but do not address the issue *sub judice* (Report at 68-69, 70-71); (2) misquotation of inapplicable and unhelpful statutory language; and (3) unsupported assumptions concerning Escape's data. First, no court decision has actually held that "termination" necessarily means complete eradication of a user's account and deletion of all related content, and Judge Netburn does not cite to any such decision. In fact, it appears that no court has addressed the present issue, *i.e.,* whether disabling upload capabilities is a statutory equivalent to "termination" under the DMCA. For the reasons set forth above, this Court should find that it is, as it serves the DMCA's purpose to quell infringement.

Second, contrary to the Report (at 69), Congress's use of the phrase "disabling access to, or removal of, material or activity claimed to be infringing" in § 512(g)(1), does not shed any light on the meaning of "termination" in § 512(i). The former language does not even refer to a service provider's management of user accounts or implementation of its "repeat infringer" policy. Rather, it refers to an immunity provided to a service provider from claims based upon its deletion or disabling of access to content "claimed to be infringing" in a DMCA notification. 17 U.S.C. § 512(g)(1). In other words, this phrase refers to treatment of content, not account holders, and thus its language does not illuminate what Congress meant by "termination" of account holders in § 512(i).

Third, the Court should reject Judge Netburn's appeals to "equity" to interpret the DMCA. Judge Netburn found that upholding Escape's practice of disabling uploads would "benefit infringers" and allow "Escape to further profit from repeat infringers' content." (Report at 72-73.) In support of this rationale, the Court finds that the deletion of "terminated" users' content would result in the loss of "approximately half of all the content in [Grooveshark's] active music library." (Id. at 72 n.21.) This rationale rests on both a legal fallacy and an unfounded factual assumption. As a matter of statutory interpretation, the DMCA strikes a balance between the rights of copyright holders and the unfettered operations of open-platform internet service providers, like Grooveshark. See Viacom Int'l, Inc. v. YouTube, Inc., 718 F.

Supp. 2d 514, 526-27 (S.D.N.Y. 2010).  Thus many provisions of the DMCA could be portrayed as "benefitting infringers," such as the well-established rule that internet service providers need not monitor or affirmatively filter infringing content on their websites.  See, e.g., Id. at 524.  The appropriate question, therefore, is whether Escape's disabling of upload capability serves the statute's purpose, which, as discussed above, it does.  In addition, Judge Netburn's "equity" rationale assumes that each and every audio file uploaded by a user who has received even one DMCA notification is infringing.  (See Report at 72 n.21; citing EMI SMF ¶ 140.)  There is no evidence to support this broad assumption, as Horowitz merely asserted (for the first time in his summary judgment Declaration) that Groovehark users that have received DMCA notices have uploaded 48% of the content available on the service.  (Horowitz Decl. ¶ 75; Opp'n Memo. at 21.)  However, EMI did not adduce, and Judge Netburn did not cite, evidence concerning what proportion of that content may be infringing.  Indeed, the strong probability that such content includes non-infringing uploads counsels *against* interpreting account "termination" to require blanket removal of all content uploaded by a particular user, particular as the DMCA provides an explicit mechanism for targeted takedowns of actually infringing files identified by content owner.

In short, this Court should find that Escape's practice of disabling upload capabilities satisfies the DMCA's requirement of account "termination" for repeat infringers.

## ii. *Escape Maintains More Than Adequate Records of User Activity.*

Judge Netburn also found that Escape does not "implement" its repeat infringer policy because its "record-keeping practices prevent Escape from implementing its repeat infringer policy."  (Report at 59.) This determination appears to rest upon a fundamental misunderstanding of undisputed evidence concerning the data that is collected and maintained by Escape.  The only data that is arguably "missing" from Escape's comprehensive database is a 16-month period of data from a particular table, DMCAUsersTakedowns, which is used by Escape as a step in its DMCA takedown process, triggering the issuance of a notification email to the user and disabling that user's uploading privileges.  (Hostert Decl. ¶ 27.)  But that is not the only table that records Escape's processing of DMCA notices of infringement.

21

Rather, Escape records the removal of files in response to DMCA notices, *inter alia*, by moving data contained in its "UsersFiles" table, which links each file on Grooveshark with the accountholder who submitted it, to a related data table entitled "Deleted_UsersFiles." (Hostert Decl. ¶ 26.) As discussed below, Judge Netburn's analysis concerning the adequacy of Escape's data is plainly erroneous.

First, Judge Netburn cites to the Horowitz data analyses to support the conclusion, in essence, that Escape's "one strike" policy is not 100% effective in preventing repeat infringement on the Grooveshark site. (See Report at 62-63.) But, as noted by Escape in opposition to the Motion, it is well established that the DMCA "does not require [a service provider] to maintain a perfect policy (or even anything as stringent as [a] three-strikes policy . . .)." Disney Enters., Inc. v. Hotfile Corp., 11 Civ. 220427, 2013 U.S. Dist. LEXIS 172339, at *68 (S.D. Fla. 2013); Opp'n Mem. at 40. Perhaps recognizing this, Judge Netburn acknowledges that Horowitz's data analyses concerning repeat infringers "may not establish that Escape fails to 'implement' a repeat infringer policy under § 512(i) as a matter of law." (Report at 64.) Instead, Judge Netburn held that, in light of the evidence provided by Horowitz of repeat infringers on Grooveshark, Escape "cannot justify a failure to keep adequate records of repeat infringers." (Id.) This holding is erroneous: Escape *does* keep records of repeat infringers.

Every music file submitted to Grooveshark is linked to the accountholder that submitted it in a table entitled UsersFiles, which was produced to EMI in discovery. (Hostert Decl. ¶ 26.) When a file is removed from Grooveshark as a result of a DMCA notification, the UserFiles records related to that file, including the related accountholder information, is moved to a new table, "Deleted_UsersFiles," and maintained in that table by Escape. (Id.) The accountholder identified in first UsersFiles entry associated with the file, who is the user that uploaded the file, is recorded in the DMCAUsersTakedowns table, but all information linking the file to that user, and any other user that "scanned" - - *i.e.,* submitted or attempted to upload the file after it already existed on Grooveshark - - is maintained in the Deleted_UsersFiles table. (Id. ¶¶ 26, 27) This fact is undisputed, and beyond dispute. Indeed, the existence of such data is precisely how Horowitz was able to reach conclusions such as the number of

files uploaded by the 37,986 users that EMI admits were recorded as infringers through Escape's DMCA process. (See Horowitz Decl. ¶¶ 67, 73.) The existence of this data is apparently overlooked by Judge Netburn, which is the only explanation for erroneous statements in the Report, such as that Escape "fails to keep records that would allow it" to "identify repeat infringers." (Report at 64.) Indeed, using Escape's own data, EMI purports to identify "repeat infringers" through Horowitz. Thus, it cannot be said that Escape does not keep adequate records of infringing users, and the Report is incorrect in its assertion to the contrary.

At most, EMI has shown, and Judge Netburn has found, that, in operating its "one strike" policy, Escape does not have in place a process to check whether certain "repeat infringers" have "slipped through the cracks." It is undisputed that, as a matter of policy, Escape records accountholders as infringers, and bars their uploading capability, after only *one instance* of infringement identified by a DMCA-compliant notification, which EMI admits that Escape has done with respect to 37,986 accountholders (and Escape avers it has done for more than 38,900 accountholders). To the extent that this practice does not work as intended on any given occasion, for whatever reason - - EMI has identified 1,609 such instances (or a mere 4.2% of the number of recorded infringers) (see Report at 63) - - it is likely that those accountholders who do fall through the cracks will properly be recorded as a result of the next DMCA notification addressed to one of their uploads.[12] But, as noted above, Judge Netburn recognized that those facts do not establish that Escape failed to "implement" its repeat infringer policy as a matter of law, which is why she chose to focus on Escape's supposed "inadequate records." (Report at 64.) Because Judge Netburn apparently misunderstood (or, for some reason, ignored) Escape's comprehensive records connecting all users - - including "repeat infringers" - - to the files that are the subject of DMCA takedown notifications, her decision on this issue is erroneous.

---

[12] This fact is not contradicted by Horowitz's assertion that certain Grooveshark users have been recorded for infringement with respect to more than 100 or 1,000 recordings, as an accountholder can receive multiple DMCA notifications simultaneously, or receive a series of DMCA notifications for particular files from a previously uploaded group of files even after he or she has been recorded as an infringer and had his or her upload privileges revoked by Escape.

### iii.     *Escape's Organization of User-Submitted Files Does Not Invalidate its DMCA Defense as a Matter of Law.*

Judge Netburn also found that, independent of the data maintained by Escape, the organization of user-submitted audio files on Grooveshark "*may* 'actively prevent copyright owners from collecting information needed to issue [DMCA] notifications' in a manner that would have any meaningful consequence." (Report at 65 (emphasis added).)  This equivocal statement merely identifies a factual issue for determination at trial, rather than invalidating Escape's DMCA defense as a matter of law. Judge Netburn identified two aspects of Escape's internal processes that she asserted "may actively prevent" copyright owners from carrying their burden under the DMCA of policing the Grooveshark site for infringement:  (1) Escape's grouping of files by song metadata (*i.e.*, artist, title, album) and selection of a single "primary file" that is accessible through the Grooveshark website; and (2) Escape's "DMCA Lite" procedure, through which it removes audio files that it is able to identify based upon non-compliant DMCA notifications, but does not bar uploading capabilities for associated accountholders.  (Report at 65-67.)  Escape addressed the purposes and effects of these practices in its opposition papers, to which it respectfully refers the Court.  (See Opp'n Mem. at 39, 43-44.)  Judge Netburn's analysis of these practices rests on inaccurate assumptions of fact and a resulting exaggeration of their supposed deleterious effects on the ability of content owners to police copyright infringement on Grooveshark.

In summary, the Grooveshark service groups user-uploaded files that have similar associated song metadata, without "listening" to those files to determine what recordings are embodied on them, then selects one of those files as the "primary file" made available for streaming on the website.  (Hostert Decl. ¶¶ 14, 15.)  The primary file and non-primary files are associated based solely on song metadata, not audio content, and so the grouped files can, and sometimes do, include entirely different recordings.  (Id. ¶ 14; Kowalski Decl. ¶¶ 18, 19.)  Judge Netburn's implication that Escape does not record users who submit non-primary files is incorrect; Escape's database always associates a user with each uploaded recording.  (Hostert Decl. ¶ 26.)  Contrary to Judge Netburn's analysis, the sole effect of Escape's "primary file" practice is that only one of the grouped files is available on the website at a time, and thus

visible to content owners. While this may require content owners such as EMI to issue DMCA

notifications *seriatim* - - *i.e.*, a notification addressed to the primary file, followed by Escape's removal of

the content, and then, *if* the next primary file contains the same recording, issuance of a subsequent notice,

etc. - - it does not "prevent" copyright owners from policing the site. To the contrary, there is never

content available on Grooveshark that is invisible to copyright owners or for which Escape has not

recorded the uploading accountholder. Judge Netburn's finding to the contrary (Report at 67) is contrary

to clear evidence and erroneous.[13]

Moreover, Judge Netburn's analysis of Escape's "DMCA Lite" process is similarly erroneous.

This process is above and beyond what is required by the DMCA, as it refers to Escape's removal of

content pursuant to notices that fail to comply with the statute's requirements because, for example, they

are not signed under oath or do not adequately identify the location of the alleged infringement on

Grooveshark, which has been held to be an insufficient basis for terminating users. (Opp'n Mem. at 39;

Tarantino Decl. ¶¶ 21, 22.) EMI has not identified, and Judge Netburn does not cite, a single instance in

which this policy was misapplied to a DMCA-compliant notification, yet Judge Netburn assumes, without

any evidentiary basis, that it is *always* so misapplied - - that is the only explanation for her repeated

reference to the prevalence of Escape's DMCA Lite takedowns. (See, e.g., Report at 66.) But that

assumption is unsupported by any evidence. Absent such evidence of its misapplication, Escape's

---

[13] Judge Netburn's faulty analysis is only underscored by her misinterpretation of EMI's evidence concerning the song Blueberry Hill by Fats Domino. (Report at 66; citing Horowitz Decl. Ex. 13 at 7.) Judge Netburn incorrectly assumes that all 107 files allegedly containing "Blueberry Hill" were grouped together at the same time on Grooveshark under one song record, with a single "primary file" accessible on Grooveshark. There is no evidence of this. First, the song metadata identified by EMI in Horowitz Exhibit 13 is derived from Audible Magic's analysis of Escape's MP3s (Horowitz Decl. ¶ 79); it is not the user-generated song metadata from the Grooveshark system, which could have identified the audio files disparately, leading to different song groupings. Indeed, each of the 107 files could have been available on Grooveshark independently, at different times, with each a "primary file." In that case, the existence of multiple File IDs would merely be a result of Grooveshark users repeatedly re-uploading the recording after Escape removed it, combined with the well-established fact that Escape is not required under the DMCA to affirmatively filter out or block user uploads absent a DMCA notice. See UMG Recordings, Inc. v. Veoh Networks Inc., 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009) (the fundamental "principle underlying the DMCA safe harbor [is] that the burden is on the copyright holder, not the service provider, to identiy copyright violations."). Judge Netburn's factual assumptions lead her to conclude, incorrectly, that the fact that Escape could "receive 106 separate and consecutive notifications from a copyright owner for a single song" necessarily means that it is not complying with the DMCA, as a matter of law.

DMCA Lite policy, by its very definition, is simply irrelevant to whether Escape has "implemented" a repeat infringer policy under the DMCA.[14]

## B. Judge Netburn Erred in Finding Escape's Implementation of Its Policy Unreasonable as a Matter of Law.

Judge Netburn found, in the alternative, that Escape's implementation of its repeat infringer policy was not "reasonable." (Report at 79.) This holding is based upon several erroneous findings: (1) that Escape provided "no evidence" it has disabled the uploading capability of accountholders (id. at 74); (2) that Escape's DMCA Lite procedure is unreasonably "implemented" (id. at 75); (3) that for a 16-month period of missing data from the DMCAUsersTakedown table "at most, Escape removed user files under its DMCA Lite procedure" (id. at 76); (4) that Escape fails to process takedowns for non-primary files when it receives a DMCA notification for a "primary" file (id. at 76-77); and (5) that Escape has "fail[ed] to show that it disabled the uploading privileges of any of the users who submitted EMI content after March 23, 2013" (id. at 78). Each of these findings, some of which Escape has already addressed above, are erroneous. This Court should reject Judge Netburn's determination that Escape does not "reasonably implement" its repeat infringer policy as a matter of law.

First, Kowalski testified, in his improperly excluded Declaration, that Escape disabled upload capabilities of "more than 38,900 Grooveshark accountholders," and he identified the data - - produced to EMI in discovery - - that establishes this number. (Kowalski Decl. ¶ 6.) This number is consistent with Horowitz's assertion, also gleaned from Escape's data, that Escape recorded nearly 38,000 users as infringers in the DMCAUsersTakedowns table. Judge Netburn's assertion that Escape "does not attempt to explain the circumstances" of the disabling of those account holders is perplexing, as Escape describes

---

[14] In light of the foregoing, Judge Netburn's comparison of Escape's automatic, content neutral organization of uploaded audio files to the service providers' conduct in the Aimster case is unwarranted. In Aimster, the service provider taught its users "how to encrypt their distribution of copyrighted materials" and thereby "disabled itself from doing anything to prevent infringement." In re Aimster Copyright Litig., 334 F.3d 643, 655 (7th Cir. 2003). Escape has not disabled itself or copyright owners from identifying infringing material on the site or sending DMCA takedown notifications; it has, at most, organized and presented user uploaded files in such a fashion that a copyright owner may need to notify Escape of infringing files separately, in series. There is no basis to hold that this invalidates Escape's DMCA defense as a matter of law.

in detail its "one strike" policy with respect to infringing uploads, including how it records and processes the disabling of user uploading privileges. (See Hostert Decl. ¶¶ 24-29.)

Second, as set forth above, Escape's DMCA Lite process, by definition, goes above and beyond what is required by the DMCA, and has no bearing on the question of Escape's "repeat infringer" policy under the DMCA. Judge Netburn acknowledged that the policy "is not by itself unreasonable" (Report at 75), but then found it significant that Escape has not demonstrated "that the DMCA notifications as to any of those files" treated as DMCA Lite "were deficient" (id. at 76). This was not Escape's burden on summary judgment, as EMI argued only that the existence of the policy invalidated Escape's DMCA defense, without demonstrating itself that the policy was misapplied in any particular instance. It is EMI, not Escape, that failed to meet its burden concerning Escape's DMCA Lite policy and this Court has no basis to find that Escape did not follow its stated policy, determined by Judge Netburn to be "reasonable" on its face. (See Tarantino Decl. ¶¶ 21-23.)

Third, Judge Netburn ignored Escape's contrary evidence in ruling that, in light of the data missing from Escape's DMCAUsersTakedowns, Escape removed all user files under its DMCA Lite procedure for "a period of at least 16 months" ending in March 2012. (Report at 76.) The only thing that EMI has succeeded in proving beyond dispute is that there is data missing from the DMCAUsersTakedowns table (which, as discussed above, is not the sole data concerning Escape's takedowns of particular user uploads or the disabling of user upload privileges). Escape offered evidence in the improperly excluded Kowalski Declaration that Escape not only removed access to millions of files during this period but did, in fact, disable upload privileges for hundreds of accountholders during this 16 month period. (Kowalski Decl. ¶¶ 11-13.) In any event, this "missing data" is much ado about nothing, as it pertains solely to a period of time during which EMI and Escape were counterparties to the Distribution Agreement. It is undisputed that Escape both maintains data in its UsersDMCATakedowns table, and has processed DMCA-compliant take down notifications by disabling user upload capabilities,

during the period of time addressed by EMI's copyright infringement claim (*i.e.*, after the March 22, 2012

termination of the Distribution Agreement).

Fourth, the Report's conclusion concerning Escape's practices in respect of non-primary files

betrays Judge Netburn misapprehension of Escape's automated file grouping processes. Judge Netburn

claims that, unless the process "fails to perform as intended, . . . if a primary file is infringing, so too are

the non-primary files," and they should presumably also be taken down in response to a DMCA

notification addressed to the primary file. (Report at 78.) But this assumption is unwarranted. As

described in its opposition brief (at 32) and in the Hostert Declaration (at ¶¶ 13-19), Escape's grouping of

files is based solely on metadata added by users at uploading. Neither the Grooveshark system nor any

Escape employee determines what recordings are actually embodied within the audio files, and, as a

result, it is possible (indeed the Kowalski Declaration proves the point) that a group of files organized into

a single song record contains several different recordings. (Hostert Decl. ¶¶ 13, 14; Kowalski Decl. ¶¶ 18,

19.) In light of that circumstance, it is clearly not unreasonable for Escape to take down only the primary

file in response to a DMCA notification, particularly as none of the non-primary files are available to

users of Grooveshark and, if and when they do replace a primary file and become accessible, the content

owner may review that file, determine whether it is infringing, and then, if appropriate, submit a DMCA

notice to Escape.

Finally, the Report's suggestion that Escape was required to show that it disabled upload

capabilities of users that submitted EMI recordings to Grooveshark after termination of the Distribution

Agreement reflected Judge Netburn's willingness to place burdens on Escape that are contrary to the

requirements of the DMCA. EMI does not point to a single DMCA notification sent to Escape in respect

of EMI recordings following termination of the Distribution Agreement. If EMI had sent such a

notification, the evidence demonstrates that Escape would have processed the notification, taken down the

subject files and applied its "one strike" policy. The Court's suggestion that Escape somehow has the

obligation to affirmatively "filter those files and identify the infringing users," without any DMCA

notification, is contrary to well-established law that confirms that service providers such as Escape are *not obligated to* actively monitor or filter out infringement by their users.  See Veoh Networks Inc., 665 F. Supp. 2d at 111.

## Conclusion

For the reasons set forth above, the Court should reject Judge Netburn's Report and Recommendation and should deny the Motion.

Dated: New York, New York
June 19, 2014

**ROSENBERG & GIGER P.C.**

By:_____
     John J. Rosenberg
     Matthew H. Giger
     Brett T. Perala
     250 Park Avenue, 12th Floor
     New York, New York 10177
     Tel: (646) 494-5000

     *Attorneys for Defendant*
     *Escape Media Group, Inc.*