UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAPITOL RECORDS, LLC d/b/a EMI MUSIC
NORTH AMERICA,

                              Plaintiff,

        – against –

ESCAPE MEDIA GROUP, INC.,

                              Defendant.

No. 12 Civ. 06646 (AJN) (SN)

ECF CASE

**PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 72 OBJECTIONS TO THE**
**REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE NETBURN**

*Of Counsel:*

Ilene S. Farkas
Benjamin K. Semel
Erich C. Carey
Donald S. Zakarin

PRYOR CASHMAN LLP
7 Times Square
New York, New York  10036
Tel.: (212) 421-4100
Fax: (212) 326-0806

*Attorneys for Plaintiff*
*Capitol Records, LLC d/b/a*
*EMI Music North America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. ii

PRELIMINARY STATEMENT ..................................................................................................... 1

THE REPORT AND RECOMMENDATION ................................................................................. 2

    I.    Standard of Review ........................................................................................................... 2

    II.   Undisputed Facts ............................................................................................................... 3

    III.  Rulings With No Objection .............................................................................................. 5

    IV.  Escape's Objections .......................................................................................................... 6

        A.  Escape Fails To Meet The 512(i) Condition Of Eligibility
           For The DMCA Safe Harbor ..................................................................................... 6

           1.  Standards For Summary Judgment On Escape's Affirmative Defense ............... 6

           2.  Escape Fails to Implement A Repeat Infringer Policy ........................................ 7

               a.  Escape Admittedly Does Not Implement Its Adopted and Noticed Policy .... 7

               b.  Escape Implements No Policy
                   Providing For Termination Of Users ......................................................... 9

               c.  Escape Does Not Adequately Record Infringers ........................................ 10

               d.  Escape Organizes Content to Thwart Content Owners ............................... 12

           3.  Escape Fails to "Reasonably" Implement A Repeat Infringer Policy ............... 13

        B.  EMI Did Not Release Claims For Infringement Prior To Contract Termination ..... 16

        C.  Rule 37 Evidentiary Challenges ............................................................................... 17

           1.  Copysense Software and Audible Magic .......................................................... 19

           2.  Dr. Horowitz's Analysis of Escape's Data ....................................................... 21

           3.  The Kowalski Declaration ................................................................................ 23

        D.  Issues Briefed That Were Not Reached Due To The
           Ruling Of Safe Harbor Ineligibility ......................................................................... 24

CONCLUSION .............................................................................................................................. 25

i

## TABLE OF AUTHORITIES

**CASES(s)**                                                                                                                                    **PAGE(s)**

Alston v. W. 88th Garage, L.L.C.,
    No. 11 Civ. 8317 (AJN) (HBP), 2012 U.S. Dist. LEXIS 180387
    (S.D.N.Y. Dec. 20, 2012)................................................................................... 2

American Automotive Accessories, Inc. v. Fishman,
    175 F.3d 534 (7th Cir. 1999) ........................................................................... 17

Budhoo v. Superintendent,
    No. 11 Civ. 1331 (AJN), 2014 U.S. Dist. LEXIS 22987 (S.D.N.Y. Feb. 21, 2014) .......... 3

Bank of America Nat'l Trust & Sav. Asso. v. Gillaizeau,
    766 F.2d 709 (2d Cir. 1985)............................................................................. 16

Capitol Records, Inc. v. MP3tunes, L.L.C.,
    821 F. Supp. 2d 627 (S.D.N.Y. 2011)................................................................. 7

Capitol Records, Inc. v. Naxos
    4 N.Y.3d 540 (2005) ...................................................................................... 5

Capitol Records, LLC. v. ReDigi, Inc.,
    934 F. Supp. 2d 640 ...................................................................................... 5

Capitol Records, Inc. v. Greatest Records, Inc.,
    43 Misc. 2d 878 (Sup. Ct. N.Y. Co. 1964) ........................................................ 5

Cardell Fin. Corp. v. Suchodolski Assocs.,
    896 F. Supp. 2d 320 (S.D.N.Y. 2012) .............................................................. 18

Christophersen v. Allied-Signal Corp.
    939 F.2d 1106 (5th Cir.1991) ........................................................................ 17

Courtney v. Colvin,
    No. 13 Civ. 02884 (AJN), 2014 U.S. Dist. LEXIS 4559 (S.D.N.Y. Jan. 14, 2014).......... 3

Ellison v. Robertson,
    357 F.3d 1072 (9th Cir. 2004) ....................................................................... 9

GE v. Joiner,
    522 U.S. 136 (1997)..................................................................................... 17

LaSalle Bank Nat. Ass'n v. Nomura Asset Capital
    424 F. 3d 195 (2d Cir. 2005)......................................................................... 17

Laster v. Mancini,
    No. 07 Civ. 8265 (DAB), 2013 U.S. Dist. LEXIS 138599 (S.D.N.Y. Sept. 25, 2013)...... 3

ii

**CASES(s)**                                                                                           **PAGE(s)**

McMillian v. Johnson
    88 F. 3d 573 (11th Cir. 1996), aff'd,
    520 U.S. 781 (1997)...............................................................................23

Metito (Overseas) Ltd. v. GE.
    No. 05 Civ. 9478 (GEL), 2009 U.S. Dist. LEXIS 12590 (S.D.N.Y. Feb. 17, 2009).......... 3

Pigott v. Sanibel Dev., L.L.C.,
    Civ. A. No. 07-0083-WS-C, 2008 U.S. Dist. LEXIS 55806 (S.D. Ala. July 23, 2008) .. 18

Raskin v. Wyatt Co.
    125 F.3d 55 (2d Cir. 1997).................................................................. 17

RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,
    No. 94 Civ. 5587 (PKL), 2000 U.S. Dist. LEXIS 4892 (S.D.N.Y. Apr. 17, 2000)........... 8

Sprint/United Mgmt. Co. v. Mendelsohn,
    552 U.S. 379 (2008)........................................................................... 18

Tarafa v. Artus,
    No. 10 Civ. 3870 (AJN) (HBP), 2013 U.S. Dist. LEXIS 101334
    (S.D.N.Y. July 18, 2013) ..................................................................... 3

SEC v. Meltzer,
    440 F. Supp. 2d 179 (E.D.N.Y. 2006) ...................................................... 6

Watson v. Geithner,
    No. 11 Civ. 9527 (AJN), 2013 U.S. Dist. LEXIS 141009 (S.D.N.Y. Sept. 27, 2013) .. 3, 5

Wells Fargo Bank v. ESM Fund I, LP,
    No. 10 Civ. 7332 (AJN), 2012 U.S. Dist. LEXIS 102990 (S.D.N.Y. July 24, 2012) ........ 3


**STATUTES**

Fed. R. Civ. P. 37 ...................................................................................6, 17

Fed. R. Civ. P. 37(c)(1) ..............................................................................20

Fed. R. Civ. P. 72(b)(2) ............................................................................. 3

Fed. R. Civ. P. 72(c) ..................................................................................18

N.Y. Penal Law § 441-c 1 (McKinney 1967) (supplanted by N.Y. Gen . Bus. Law § 561) ...........5

S.D.N.Y. Local Rule 56.1(b) .....................................................................4, 6

17 U.S.C. § 512(c) ............................................................................. 10, 24

iii

17 U.S.C. § 512(c)(1)(A) ........................................................................................... 24

17 U.S.C. § 512(c)(1)(B) ........................................................................................... 24

17 U.S.C. § 512(i) ................................................................................................. *passim*

17 U.S.C § 512(i)(1)(A) ...............................................................................................9

28 U.S.C. § 636(b)(1) ................................................................................................. 2

## PRELIMINARY STATEMENT

In response to Judge Netburn's comprehensive 80-page Report and Recommendation to this Court (the "Report") – the most detailed, analytic and case authority documented application of 17 U.S.C. §512(i) that any court has issued to date – Escape has simply ratcheted up the same empty hyperbole and attorney argument that it presented to Judge Netburn and which she decisively rejected. Escape's Objections to the Report and Recommendation of the Magistrate Judge ("Objection") contends that the Report misunderstands the law and facts. It does not.

Escape very selectively lifts quotes from a limited number of cases, studiously ignoring that they bear no factual similarity to this case. In contrast, the Report includes a detailed examination of two dozen precedents, encompassing every significant decision issued with respect to Section 512(i), and analyzes the legal principles derived from this body of law with regard to the specific undisputed facts in this case. The Report cuts through Escape's fabrication of non-existent factual issues, creating an unobscured recitation of the undisputed facts that entitle EMI to summary judgment. The Report breaks down not merely the history of Grooveshark's operations and the testimony of its witnesses, but also dissects and renders clear the technology at issue and the facts proven through database analyses.

Moreover, consistent with established summary judgment standards, the Report granted Escape every reasonable inference and resolved any doubts in its favor. Despite the fact that Escape's Rule 56.1 Response either admitted or failed to provide evidence controverting every material fact, Judge Netburn's Report individually reviewed the undisputed facts set forth by EMI, comparing cited facts with evidence in Declarations, deposition testimony and exhibits to determine whether a fact was established. As the Report concluded, the evidence establishing the blatant and purposeful illegality of Escape's massive piracy enterprise was overwhelming.

Like Captain Renault in *Casablanca*, Escape can only feign surprise at the Report because it knows that Grooveshark is an infringing machine. The quote that opened EMI's moving papers said it all: Escape's leaders laughed at the law and laughed at the courts, intentionally building an enterprise designed to infringe copyrights and game the system. Judge Netburn issued a Report of exceptional detail and overwhelming precedent. The obvious time and effort that she devoted to studying the record and the cited precedents placed before her is deeply appreciated by EMI.

EMI based this summary judgment motion on evidence produced *by Escape*. Faced with a mountain of evidence taken exclusively from Escape's *own records*, evidence which is incapable of being disputed, Escape instead professed ignorance of its own data and essentially sought to discredit its own documents. Instead of raising disputed facts, Escape's motion papers delivered a threat to force a trial consisting of a "time consuming presentation by EMI of voluminous evidence." But this ignores the rules that govern summary judgment, which require Escape to come forth with evidence to raise triable issues of material fact. In the end, the Report rejected Escape's attempt to make a farce of the summary judgment process and force a trial solely based on naked arguments and not on either actual facts or applicable law.

## THE REPORT AND RECOMMENDATION

## I.   Standard of Review

As this Court set forth in *Alston v. West 88th Garage, LLC*, No. 11 Civ. 8317 (AJN) (HBP), 2012 U.S. Dist. LEXIS 180387, at *2 (S.D.N.Y. Dec. 20, 2012):

> When a magistrate judge issues findings or recommendations, the district court "may accept, reject, or modify [them] in whole or in part." 28 U.S.C. § 636(b)(1). The court reviews de novo any portions of a magistrate judge's report and recommendation to which a party has stated a timely objection. Id. As to those portions that neither party objects to, the court may review for clear error. However, "new arguments and factual assertions cannot properly be raised for the

first time in objections to the R&R, and indeed may not be deemed objections at all." [internal citations omitted]

*See also Wells Fargo Bank, N.A. v. ESM Fund I, LP*, No. 10 Civ. 7332 (AJN), 2012 U.S. Dist. LEXIS 102990, at *3 (S.D.N.Y. July 24, 2012) ("Courts generally do not consider new arguments or new evidence raised in objections to a magistrate judge's report and recommendation that were not presented to the magistrate judge."); *Watson v. Geithner*, No. 11 Civ. 9527 (AJN), 2013 U.S. Dist. LEXIS 141009, at *4-7 (S.D.N.Y. Sept. 27, 2013) ("party waives any arguments not presented to the magistrate judge"); *Tarafa v. Artus,* No. 10 Civ. 3870 (AJN) (HBP), 2013 U.S. Dist. LEXIS 101334 at *5 (S.D.N.Y. July 18, 2013) (same).

"Federal Rule of Civil Procedure 72(b)(2) requires a party's objections to be 'specific,' and a district judge may review for clear error any portions of a magistrate's recommendations to which only 'conclusory or general' objections are made." *Watson*, 2013 U.S. Dist. LEXIS 141009, at *4-7. *See also Budhoo v. Superintendent*, No. 11 Civ. 1331 (AJN), 2014 U.S. Dist. LEXIS 22987, at *4-5 (S.D.N.Y. Feb. 21, 2014) ("[w]hen a party's objections to the R & R are merely 'conclusory or general', however, the Court will review the [R & R] only for clear error.") (citation & quotations omitted); *Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 102990, at *2-3.

"A decision is 'clearly erroneous' when the reviewing Court is left with the definite and firm conviction that a mistake has been committed." *Courtney v. Colvin*, No. 13 Civ. 02884 (AJN), 2014 U.S. Dist. LEXIS 4559, at *3-4 (S.D.N.Y. Jan. 14, 2014) (quoting *Laster v. Mancini*, No. 07 Civ. 8265 (DAB), 2013 U.S. Dist. LEXIS 138599, at *6-7 (S.D.N.Y. Sept. 25, 2013)).

## II.   <u>Undisputed Facts</u>

Just as the Report noted with respect to Escape's opposition to summary judgment, glaringly absent from Escape's Objection is any *evidence* of material issues of disputed fact, a failure that was lethal to Escape's motion opposition and is equally lethal to this Objection.

EMI's Local Rule 56.1 Statement of Undisputed Facts identified 147 undisputed facts, citing specific evidence establishing each fact.  Virtually all of the facts were proven by Escape's *own testimony and records*.  In response, Escape offered no evidence controverting the facts, but rather offered naked objections to EMI's presentation of Escape's own data.  Escape refused even to address such straightforward facts as how many Grooveshark users exist, how many files and songs are in its music library, and how its basic operations functions.  Escape also chose to submit <u>no</u> controverted facts of its own.  *See* Local Rule 56.1(b) ("The papers opposing a motion for summary judgment shall include… if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.")

Having carefully reviewed the submissions, the Report held that "Escape has not provided evidence sufficient to raise disputes as to any material facts proposed in EMI's statement of material facts."  (R 37)[1]  And yet, Judge Netburn did not simply accept the uncontradicted facts presented by EMI.  She independently examined the cited evidence for each of EMI's 147 undisputed facts, ultimately finding that only proposed fact No. 54 – which does not impact on any issues in the Objection – was not established by the evidence. (R 38)  The Report also holds that the facts laid out in pages 27 to 37 are "supported adequately by admissible evidence and are admitted without controversy for the purposes of this summary judgment motion." (R 27)

Despite the legal requirement that it provide specific objections, Escape's Objection provides no specific objection to any of the facts deemed established in the Report.  Instead, the Objection substitutes inflamed rhetoric claiming general errors without tethering a single objection to a single *specific fact* deemed admitted or undisputed.  Escape's failure to controvert

---

[1] The Report will herein be cited as "R" followed by the cited page numbers.

EMI's specific facts on summary judgment, combined with its failure in the Objection to specifically object to any of the Report's findings of fact, is fatal to Escape's arguments and safe harbor affirmative defense, on which it bears the burden of proof.[2]   *See Watson*, 2013 U.S. Dist. LEXIS 141009, at *4-7 (noting "clear error" standard of review as to any portions of report to which only "conclusory or general" objections are made).  In the end, Escape's utter failure of proof cannot be overcome by attorney argument, hyperbole, the use of jargon or any of the other devices which Escape substitutes in its Objection for what is necessary: evidence.

### III.   Rulings With No Objection

Escape's Objection also fails to raise any objection with respect to critical legal rulings in the Report, including that:

- EMI owns the 2,807 sound recordings at issue (R 42)

- Escape is directly liable for infringement of the public performance right from unauthorized streaming on Grooveshark (R 42-43)[3]

---

[2] Nor can the scant Kowalski Declaration carry this burden.  As the Report notes, this declaration is addressed to four facts.  (R 21)  The Report's rulings are not based on the absence of these facts, and the Kowalski Declaration is a red herring in the Objection. (R 74, fn. 22)

[3] Escape offers in a footnote a throwaway argument that was not raised before Judge Netburn against its public performance liability for EMI's pre-1972 sound recordings under state common law.  Escape does not offer a single case to support its counterintuitive proposition, which runs against a principle guiding analyses of state common law protection against unauthorized copying, namely that state law "mirrors" federal law elements.  *Capitol Records, LLC v. ReDigi, Inc.*, 934 F. Supp. 2d 640, 657-58 n.8 (S.D.N.Y. 2013) (citing *Capitol Records, Inc. v. Naxos*, 4 N.Y.3d 540, 563 (2005)).  Escape's confused argument on the issue admits that public performance liability exists under federal law, and offers no rationale or precedent for why it would not also exist under state common law.  Rather, common law protection has historically been broad, covering public performance of sound recordings long before federal law did so. *Naxos*, 4 N.Y.3d at 559.  Even the New York Penal Law provision for unauthorized copying from 1966 specifically covered acts to, "knowingly transfer or cause to be transferred any sounds recorded on a phonograph record, disc, wire, tape, film, or other article on which sounds are recorded, with intent to sell…, **or cause to be used for profit through public performance**… without the consent of the owner."  N.Y. Penal Law § 441-c of August 2, 1966 (supplanted by N.Y. Gen . Bus. Law § 561 of Sept. 1, 1967, in turn supplanted by N.Y. Penal Law § 275, eff Sept. 1, 1978) (emphasis supplied).  *See also Capitol Records, Inc. v. Greatest Records, Inc.*, 43 Misc. 2d 878 (Sup. Ct. N.Y. Co. 1964) (recognizing New York common law protection for sound recordings against unauthorized "use" or "appropriation").  Escape's unpersuasive argument, unsupported by any precedent and not even raised before Judge Netburn, should not obtain.

- Escape is vicariously and contributorily liable for infringing uploads by Grooveshark users (R 50-51)

## IV.  **Escape's Objections**

Escape's Objection is divided into three sections.  Two sections purport to address substantive portions of the dispositive ruling, while the third is a compilation of Rule 37 evidentiary objections.  Since, as the Report notes, this case "turns… on whether Escape can secure immunity from monetary liability for any infringing activity under the [DMCA]," we begin with that question.  (R 1-2)

### A.    **Escape Fails To Meet The 512(i) Condition Of Eligibility For The DMCA Safe Harbor**

#### 1.     **Standards For Summary Judgment On Escape's Affirmative Defense**

The Report articulates the burdens of proof on a motion for summary judgment seeking dismissal of an affirmative defense.  EMI's burden as movant "is satisfied if [it] can point to an absence of evidence to support an essential element of the non-movant's claim." (R 74) (citing *SEC v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006)).  EMI not only carried this burden as to Escape's safe harbor defense, but went further to affirmatively establish – through the undisputed facts and applicable legal authority – that Escape is barred from the safe harbor for its infringing activities.  Escape did not remotely satisfy its burden to present evidence raising issues of fact as to every essential element of its defense, failing to submit evidence controverting *any* of EMI's facts and failing to submit a Local Rule 56.1(b) statement of disputed facts. [4]  The

---

[4] Thus, Escape's Objection misses the mark, for example, on what its missing "DMCA Lite" records mean for this motion.  EMI provided affirmative evidence that Escape processed 94.2 percent of DMCA takedown notices using an improper "DMCA Lite" process that does not record infringers.  (R 31, 75-6; SUF 103-4, 147; Reply Br., p.9)  In its opposition and Objection, Escape merely *argues* that these notices could have been deficient, providing *no evidence of a single deficient notice*, let alone any *evidence* to explain how 94.2 percent of notices could have been deficient.  Rhetoric is not evidence, does not raise an issue of fact, and cannot carry Escape's affirmative burden to provide such evidence for its affirmative defense.

burden was Escape's to establish the defense, not EMI's to establish its absence.  In any event, EMI demonstrated beyond peradventure that the defense is not available.

### 2.   Escape Fails to Implement A Repeat Infringer Policy

The Report documents numerous *independent* grounds supporting its conclusion that Escape failed to meet a threshold requirement for eligibility under the DMCA:  reasonably implementing a repeat infringer policy.  In fact, as EMI established through the undisputed facts, Escape had no repeat infringer policy precisely because its business was intentionally built on infringing activity.  Critically, no single finding is necessary for the holding.  Rather, as the case law establishes, *inter alia*, (i) the failure to terminate repeat infringers **or** (ii) the failure to properly record infringers **or** (iii) the organization of content so as to prevent content owners from collecting information about infringement **or** (iv) the failure to reasonably implement a repeat infringer policy renders a service provider ineligible for the safe harbor protections. Escape non-existent policy fails every one of these tests, rendering it ineligible on numerous grounds.[5]  (R 57-79; Moving Br., pp. 16-34; Reply Br., pp. 6-13)   Safe harbor immunity is "not presumptive" and should be "narrowly construed."  (R 53) (quoting *Capitol Records, Inc. v. MP3Tunes*, 821 F. Supp. 2d 627, 636 (S.D.N.Y. 2011)).

### a.   Escape Admittedly Does Not Implement Its Adopted and Noticed Policy

Consistent only with its reimagining of the record, Escape begins its discussion of Section 512(i) with a mischaracterization of the Report.  Escape's Objection cynically mixes

---

[5] Citations to the summary judgment papers will be made as follows:
    "Moving Br.": EMI's Memorandum of Law in Support of Summary Judgment
    "Opp Br.": Escape's Memorandum of Law in Opposition to Summary Judgment
    "Reply Br.": EMI's Reply Memorandum of Law in Further Support of Summary Judgment
    "SUF": EMI's Local Rule 56.1 Statement of Undisputed Facts
    Summary judgment declarations will be cited by the affiant last name followed by "Decl."
 Citations to Escape's Objection papers will be made as follows:
    "Obj.": Objection to Report and Recommendation of the Magistrate Judge
    "Obj. Giger Decl.": Declaration of Matthew Giger in Support of Objection

together citations to actual facts and misstatements of facts, hoping that the Court will not be able to separate fact from fiction.  For example, Escape contends that its self-described "one strike policy" is "more strict" than the DMCA requires, ignoring that the Report devotes five pages to painstakingly taking apart Escape's bogus claims about this so-called "one strike" policy, showing its inadequacy. (R 60-65)

To begin with, this so-called "one strike" policy *is not Escape's stated policy*.  Escape *admits* that the policy it formally adopted ("adoption" here meaning only that the policy exists on paper) and noticed to users *is not implemented at all*.  As the Report holds, "it is undisputed that Escape does not implement the repeat infringer policy stated in its Terms of Service and that the Court found Escape to have formally adopted." (R 58)  That policy calls for violators to have their accounts terminated and all their content removed. (Id.; SUF 91-97, 108; Reply Br. 7) Escape did neither.

Giving Escape every conceivable benefit, Judge Netburn conducted an analysis of whether a *different* policy – the so-called one strike policy – could be found an implementation of a repeat infringer policy.  (R 59-73)  Based on undisputed facts, the Report concluded that it cannot.  However, the Report's analysis was unnecessary, as the DMCA does not allow a service provider to adopt and inform users of one policy, but actually implement a different policy (especially where the policy supposedly implemented was designed to permit and protect repeat infringers).  Section 512(i) provides that:

> The limitations on liability established by this section shall apply to a service provider only if the service provider… has **adopted** and **reasonably implemented**, and **informs** subscribers and account holders of the service provider's system or network of, **a policy** that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers. (emphasis added)

There is no ambiguity here – a single policy must be adopted, noticed to users and implemented.  All three requirements are listed in the same sentence relating to "a" policy, not multiple policies that are intentionally designed to evade identifying and terminating repeat infringers.  This provision cannot be reasonably interpreted to mean that a service provider could adopt one policy, inform users about different policy and actually implement yet another policy.  *See Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004) ("Section 512(i)(1)(A) requires service providers to: (1) adopt a policy… (2) implement **that** policy in a reasonable manner; and (3) inform its subscribers of **the** policy.") (emphasis added)  This variance is, in any event, moot because, as the Report concludes, Escape fails to implement *any* repeat infringer policy, whether the same or different from the policy that it adopted and noticed to users.

### b. Escape Implements No Policy <u>Providing For Termination Of Users</u>

Escape's attack on the Report's finding that Escape failed to implement a repeat infringer policy begins with an unavailing attack on plain English.  The Report conducts an exceptionally detailed analysis on possible constructions of the word "termination," which is what Section 512(i) requires for repeat infringers.  (R 68-73)  The Report surveys congressional intent, numerous case precedents, and principles of statutory construction, concluding that merely disabling uploads, while leaving the user active with all other functionality, does not satisfy the statutory requirement of "termination."  (R 73).

Escape's effort to redefine the term evidences only its desperation.  If the user remains active with access to all user functionality except for one feature, it is the opposite of "termination."  Even Escape's witnesses understood and accepted the obvious meaning of the word "termination" in depositions.  Colin Hostert, Escape's DMCA Agent, was asked point blank:

> Q:  [S]imply, are you aware of any instance where Escape has terminated a user's account for infringement?

A:      Not that I can recall at this time.  (Semel Decl., Exh 1, 133:14-17)

There was thus no uncertainty for Escape on this issue in depositions.  Although Hostert had *just* testified that Escape disabled uploads in a DMCA takedown, he did not hesitate to testify that there were no terminations.  (Id., 131:4-6)  Escape's DMCA Agent fully understood that "disabling uploads" was not the same as "terminating."  The Report provides exceptional authority for this conclusion, reinforced by the plain meaning of the term.[6]

The Report further notes, correctly, that Escape provided no legal support for its argument that disabling uploads does satisfy the "termination" requirement.  (R 68)  That failure continues in the Objection, as Escape offers only bare argument, without a single authority in support.  Disabling uploading capability is not termination.

### c.      Escape Does Not Adequately Record Infringers

As the Report details in over ten pages of analysis, calling what Escape does "record keeping" is a misnomer.  (R 31-32, 59-65, 74-77).  Indeed, Escape sought to avoid summary judgment by making evidentiary objections seeking to discredit its *own data and records*.  (Opp Br. 19-22; Escape's Rule 56.1 Response 131-142)

Primary among Escape's record keeping problems is that it keeps no records of repeat infringement, and did not record any infringers in connection with more than 94.2% of its takedowns.  (R 59; SUF 98, 101-104, 147; Reply Br. 8-10)  Escape's witnesses admitted these facts in depositions, leaving it to Escape's counsel to contort language in an attempt to wriggle out

---

[6] Escape also attacks a straw man "equity" issue that it created concerning this holding (Obj. 20-21), when the Report's analysis speaks to construction of the safe harbor.  (R 71-72)  The Section 512(c) safe harbor applies only to content "stored at the direction of a user."  This is the relevant "service" provided to users for safe harbor purposes.  For "termination" to be consistent with this provision, at a minimum, it must lead to *no longer storing content at the direction of the offending user*.  Escape's attempt to get credit for "terminating" a user (which it did not do) while also continuing to claim protection for "storing content at the direction of" that supposedly terminated user is a contradiction and untenable construction of the statute.

of the admissions.  Escape thus advances an incomprehensible claim that basic user activity data could be used to determine infringement.  This verbal game playing is reflected by the very title of Escape's argument section, which speaks of adequate records "of user activity."  (Obj. 21)  The question is not whether Escape keeps generalized records of "user activity," but whether Escape keeps adequate records of *infringing* activity.  The answer to the proper question is "no."

Escape misleadingly states that "every music file" has an entry in the UsersFiles database table, and an entry is made in the Deleted_UsersFiles table when it is deleted.  (Obj. 22)  Escape contends that this equates to recording infringers, never bothering to explain how records of "every music file" equates to records of infringement.  To be clear, general user records are not records of infringement.  What is needed for records of infringement is *some entry that is made showing infringement*.[7]  Escape avoids mentioning that it does have a database table to make such records – fittingly called UsersDMCATakedowns – but that this table is *virtually never used*. In 94.2 percent of takedowns, Escape uses its aptly-named "DMCA Lite" procedure *that makes no entry of infringement in any table*.  (R 59; SUF 103-04, 147)  As the Report further shows, this massive failure to record infringers is just the tip of the iceberg.  Even within the other 5.8% of cases, Escape makes records of infringement for *none* of the users who submitted infringing non-primary files and *none* of the users known to have submitted the *identical* infringing file after the first submission of that file. (R 32-33, 59, 75-77; SUF 109, 113-122; Moving Br. 27-34; Reply Br. 10-13)

---

[7] Lacking such an entry, the general records cannot tell apart files deleted using "DMCA Lite" from files deleted for any number of innocent reasons such as maintenance, corruption, etc.  Escape's facile attorney argument here is analogous to the argument that "the phone book lists people who infringe" because it lists everyone and infringers are part of everyone.  Judge Netburn, armed with the knowledge from numerous discovery conferences as to these technical issues concerning Escape's data, saw through Escape's jargon and got it absolutely right.  Escape does not keep adequate records of infringers because its business is built on infringement.  Escape's arguments here simply rehash arguments made to Judge Netburn that the Report specifically addresses and rejects based upon the undisputed evidence in the papers. (R 31-32, 59, 75-77)

These are not accidental failures to record infringers.  Escape's system was designed to enable repeat infringement.  Escape *purposefully* fails to record infringers in all but a tiny fraction of cases, and cannot evade responsibility for this by pointing to a token few infringers that were recorded as a smokescreen.  Gaming the safe harbor destroys the intended balance contemplated by the law.  The safe harbor was created only to protect "innocent" service providers, not those who design their system based on infringement and in furtherance thereof do not record infringers.

### d.      Escape Organizes Content to Thwart Content Owners

Escape's objection as to this finding in the Report begins by mischaracterizing the use of the word "may" in the Report.  (Obj. 24)  The Report notes that Escape's organization of files may actively prevent content owners from collecting information.  (R 65)  Escape tries to reshape this statement into an equivocal determination about Escape's purposeful organization of content.  It is anything but.  As the Report makes clear two pages later, there is no equivocation in the holding that, "by preventing copyright owners from ascertaining which Grooveshark users are submitting the non-primary files and from obtaining the web addresses for the non-primary files, ***copyright owners are inhibited severely from issuing DMCA notifications that have any meaningful consequences***." (emphasis added) (R 67)

As EMI aptly described Escape's system, it is a veritable Pez dispenser of piracy.  (Reply Br. 7-8)  Escape intentionally stacks multiple files for each recording so that if an infringement notice for the recording is received, Escape will take down only the first, or "Primary" file, whereupon another file of the same recording hiding behind the first in the dispenser immediately pops up to seamlessly take its place and continue the infringement.  (SUF 113-124; Moving Br. 27-31; Reply Br. 10-13)  To a Grooveshark user, there is no perceptible change – the recording remains playable, in their playlists and search results, even though Escape claims to have just processed a DMCA takedown for that very recording. (SUF 122)

Copyright owners can engage in a never-ending "takedown process" with utterly no success as new back-up files are added to the bottom of the Pez dispenser to ensure that an infringing recording remains available on Grooveshark.  The law does not permit Escape to organize its content in a manner that hides back-up content to prevent content owners from identifying all infringing material and securing its takedown. (R 65-67; Reply Br. 12-13)

Escape's arguments are just a rehash of those considered and rejected in the Report. Escape's argument that it supposedly does not know for sure that files *that it groups together under a single song listing* in fact embody the same song is utterly disingenuous, ignoring the way Escape has designed its own system of organizing songs.  As the Report explains, "Escape's 'matching' process, unless it fails to perform as intended, indicates that if a primary file is infringing, so too are the non-primary files." (R 78, 30)  This issue was extensively briefed, and is fully supported by the record. (SUF 113-124; Moving Br. 27-31; Reply Br. 10-13)

Escape's challenge to the Report's illustration of the operation of Escape's system in the context of "Blueberry Hill" is fatuous.  The Report's illustration explains clearly how Escape's system is designed to work.  (R 66)  Escape offers hypotheticals about how it "could have been" different, but Escape's theorizing is a pure evasion of the substance of the illustration.  In fact, Escape ultimately accepts the basic facts of the illustration, even admitting that, because Escape does not allow content owners to search for or identify non-primary files, "a copyright owner may need to notify Escape of infringing works separately, in a series." (Obj. 26, fn 14)  This blithe statement masks a truth that debars Escape from claiming safe harbor protection:  its system is designed to facilitate continuing infringement, assuring that a takedown notice will be ineffectual because only the top file in the Pez dispenser will be removed, after which another infringing copy will immediately be called up to replace it.

### 3.    <u>Escape Fails to "Reasonably" Implement A Repeat Infringer Policy</u>

Incapable of refuting the Report's analysis behind this central holding, Escape instead simply distorts the Report, ignoring some findings and misrepresenting others.

On this point, the Report first outlines the burdens on the motion and finds that EMI has met its burden on this issue.  (R 74)  Escape is thus required to carry its burden by submitting material evidence showing the facts on which its defense depends, which the Report finds that Escape has not done.  This finding is fully supported by the submissions on the motion.  For example, the Report finds that even if one accepted  the incompetent Kowalski Declaration, there is no evidence that repeat infringers have even had their uploads disabled (putting aside that this is not a sufficient "termination").  Escape complains, *but cannot and does not show that any repeat infringers have had their uploads disabled*.  That is because the facts are clear:  Escape does not keep records of repeat infringement.[8]  (R 59; SUF 91, 98, 101-104, 107)

The Report's findings concerning Escape's illusory and intentionally ineffectual DMCA Lite policy are unequivocal.  (R 31, 75-76)  Escape offers only unsupported argument to the contrary.  Escape similarly has no effective response to the Report's findings as to the unreasonable failure to remove non-primary (but equally infringing) files in takedowns. (R 65-67)  In the end, Escape retreats to the base and baseless accusation that Judge Netburn supposedly labored under a "misapprehension" of this issue.  Escape's problem is not that Judge Netburn misunderstood the issue, but rather that she understood all too well what Escape was doing.

The Report's analysis also identifies an important aspect of Grooveshark that is ignored

---

[8] Improperly, Escape submitted new "evidence" along with the Objection.  (Obj. Giger Decl.)  The most telling part of the submission, however, is what is *not* included.  Escape *still* does not provide evidence to controvert any of the undisputed facts in the Report.  Escape's new "evidence" just relates to its Rule 37 arguments to *preclude* analysis of its own data.  Escape still does not provide any actual *conflicting* evidence, such as whether it disabled uploads for repeat infringers, or whether it received a single deficient notice of infringement, or whether it recorded repeat infringement.  Such evidence is still not forthcoming because it does not exist, and Escape's evidentiary arguments are an artifice.

by Escape in the Objection, namely that Escape takes no action "with respect to users who submit an MP3 file with the same file hash as the file that was removed for infringement, despite the file hashes indicating that they are the exact same file and that the user is committing infringement." (R 77) This intentional failure to record infringement was briefed extensively on the summary judgment motion, and was properly addressed by Judge Netburn as further support for the Report's findings. (Moving Br., 31-34; Reply Br., 13-15) Escape does not even address, let alone object to, this finding of yet another inexcusable failure to record countless known infringers.

The Report even further analyzes Escape's knowledge and failure to respond to repeat infringement under the "red flag" knowledge standard that is imported into the Section 512(i) test. (R 77-78) As the Report shows, even if one allowed Escape to play its "metaphysical doubt" games as to whether it "knew" that files grouped under the same song are the same song, the red flag knowledge test ensures that Escape loses such games. Faced with undeniable red flags as to the infringement of all the other files grouped together with an infringing file, Escape was obligated, at a minimum, to inquire further. (Moving Br. 29-30; Reply Br. 12-13) Yet Escape never once discharged this obligation to inquire further – no accident as its system was designed to facilitate rampant infringement. (SUF 119)

Escape failed to raise any issues of fact or come forth with any evidence in its favor on these issues, and its attorney argument cannot overcome the facts and law that underlie the Report's conclusion that Escape did not reasonably implement a repeat infringer policy.

**B.**    **EMI Did Not Release Claims For**
          **Infringement Prior To Contract Termination**

Point II of the Objection – Escape's argument that the Report should have upheld its meritless claims that EMI somehow released or waived certain upload-based copyright claims – is both incorrect and irrelevant.  Escape's challenge as to uploads supposedly occurring prior to termination of the parties' contract (the "Agreement") on March 22, 2012 does not alter its liability because every single work on which EMI claims infringement was streamed (*i.e.*, publicly performed) *after* termination.  (SUF 6-7)  Escape admits this in the Objection, that "EMI explicitly restricted its claims for violation of the right of 'public performance' to 'streams after March 22, 2012.'"  (Obj. 17)  Copyright liability only requires the violation of one exclusive right, and since Escape is liable for direct infringement of the public performance right for *every* work at issue, the question of whether it is *also* liable for uploads (reproduction) cannot deter the liability holding.

Escape's argument for release of claims accruing between December 31, 2010 and March 22, 2012 is, in any event, baseless, revealed by the fact that Escape *cannot quote any release language covering this period,* as none exists.  Rather, Escape tries to *imply* a release, which must fail on the facts and law.  To begin, the Agreement only permitted Escape to distribute content provided *by EMI* under the terms of the Agreement, and specifically barred user uploads.  (SUF 19)  Escape argues that since it breached the Agreement by allowing infringing user uploads, this breach absolves it of copyright liability for the infringing user uploads that it permitted.  This Rube Golbergesque argument is bereft of evidence and is contrary to the language in the Agreement.

Unsurprisingly, Escape also fails to cite a single case to support its concoction.  On the contrary, it is black letter New York law that a release must contain an "explicit, unequivocal statement" of the release of liability.  *Bank of America Nat'l Trust & Sav. Asso. v. Gillaizeau*,

766 F.2d 709, 713 (2d Cir. N.Y. 1985).[9]

### C.    Rule 37 Evidentiary Challenges

The Report recommends that the Rule 37 evidentiary issues be disposed as part of the

overall recommendation on the summary judgment motion.  (R 7)  The standard of review for

evidentiary rulings made in connection with summary judgment is properly "abuse of discretion"

or "clear error".  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66-67 (2d Cir. 1997) (holding that

evidentiary rulings "which define the summary judgment record" are given deference; standard

of review is "manifest error" and applies to rulings on expert testimony as well) (quoting

*Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1109 (5th Cir.1991)); *LaSalle Bank Nat.*

*Ass'n v. Nomura Asset Capital*, 424 F. 3d 195 (2d Cir. 2005) (same)); *GE v. Joiner*, 522 U.S.

136, 142-143 (1997) (reversing circuit court for failure to give due deference to evidentiary

ruling, holding that while "[o]n a motion for summary judgment, disputed issues of fact are

resolved against the moving party… the question of admissibility of expert testimony is not such

an issue of fact, and is reviewable under the abuse of discretion standard.") (emphasis added) ;

*American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 540 n. 1 (7th Cir. 1999)

("'[T]he standard of review with respect to evidentiary rulings is abuse of discretion, even when

we are reviewing the grant of summary judgment.'") (citation omitted).

---

[9] Escape also perfunctorily questions the Report's ruling as to files allegedly uploaded prior to December 31, 2010, the period for which claims were released.  However, Escape submitted no admissible or cognizable evidence on this issue.  The only comment made on this point is in the discredited Kowalski Declaration.  Moreover, the question for liability is not whether there are some *files* uploaded prior to 2011, but whether the *sound recordings* on which EMI has sued were ever uploaded *after* that date.  As EMI's submissions show, the average sound recording was embodied in numerous different files.  (SUF 2-5)  If one or two of those was uploaded prior to 2011, it makes no difference to Escape's upload-based liability for that work, which is established by just one file uploaded since that date (and of course, none of this makes a difference to Escape's overall infringement liability, which is established as to all works via unauthorized public performance).  Escape offered no facts at all to show that any of the EMI works at issue were not uploaded after December 31, 2010.  Again, it is worth emphasizing that this is *Escape's own data*, it was more than capable of proffering evidence if any existed to support its argument.  As a result, the Report correctly concludes that, "Escape does not offer any argument supported by facts as to whether EMI has met its evidentiary burden" to show infringement. (R 41)

While the established precedent for this principle is in the context of circuit court reviews of district court opinions, the principle is the same.[10]  As elucidated by the Supreme Court, "[i]n deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008).  However, even if the standard of review were *de novo*, the evidentiary rulings were completely correct.

The 20-page discussion in the Report detailing the precise and powerful factual and legal rationale for each of the three evidentiary rulings is not the only reason to affirm the findings. These rulings turn on what occurred in discovery, and Judge Netburn was deeply involved in the parties' discovery issues in this action.  As such, her understanding of what transpired during discovery is unimpeachable.

As Judge Netburn was aware, Escape's repeated failures to meet deadlines or make complete productions forced EMI repeatedly to seek judicial intervention. (E.g., Docket Entries ("DE") 28, 31, 40, 42)  Judge Netburn is also familiar with EMI's attempts to accommodate numerous late productions by Escape without seeking extensions of the schedule ordered by the Court.  (E.g., DE 36)  Escape repeatedly provided fragmentary database and source code

---

[10] Nor does the language of Rule 72 call for a different result.  Rule 72(c) specifically attaches the *de novo* standard of review to portions of the "disposition," properly read as the dispositive portions of the overall Report.  *Cf.* Rule 72(a) (in contrast, not using word "disposition" in connection with non-dispositive rulings); *See also Cardell Fin. Corp. v. Suchodolski Assocs.*, 896 F. Supp. 2d 320, 324 (S.D.N.Y. 2012) ("A district court evaluating a magistrate judge's report may adopt **those portions of the report addressing non-dispositive matters** as long as [they are]… not clearly erroneous or contrary to law.") (emphasis added); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL), 2000 U.S. Dist. LEXIS 4892, 4 (S.D.N.Y. Apr. 17, 2000) ("A decision to admit or exclude expert testimony is considered 'nondispositive' of the litigation."); *Pigott v. Sanibel Dev., LLC*, Civ. A. 07-0083-WS-C, 2008 U.S. Dist. LEXIS 55806, at *14-15 (S.D. Ala. July 23, 2008) ("[C]ase law is abundant for the common-sense proposition that a magistrate judge ruling on a nondispositive matter does not somehow mutate into a ruling on a dispositive matter simply because that ruling ultimately affects the outcome of a claim or defense." (collecting cases))

productions, requiring EMI to seek more complete productions.[11]

The law directs these evidentiary matters squarely to the sound discretion of the Court. (R 10)  Applying her knowledge of the history of this case derived from her personal involvement in discovery issues, Judge Netburn appropriately determined the three evidentiary matters using proper legal standards as laid out in an extensive discussion.

### 1.  Copysense Software and Audible Magic

Escape objects to the evidence submitted by Dr. Horowitz laying out how the MP3s at issue in fact embody the sound recordings owned by EMI.  There is no dispute that EMI owns the copyrights to the sound recordings, and there is no dispute that Escape streamed the MP3s, so this is just a question of whether, for example, a given MP3 *produced by Escape* and listed as Katy Perry's "Teenage Dream" is in fact "Teenage Dream" as opposed to some other recording.  Dr. Horowitz produced a clear spreadsheet listing each MP3, along with its Grooveshark File ID and the name of the EMI recording.  Escape's burden, if it wished to contest this evidence, was to raise issues of fact as to whether any MP3 did <u>not</u> embody the recording it was named to be.

The question of whether the MP3s embody EMI works is not esoteric.  Escape's own projections estimate that it streams EMI works over 60 million times per month.  (Semel Decl., Exh 8)  There are plainly far more EMI works on Grooveshark that EMI is suing on here.  For the same reason that Escape did not challenge EMI's chain of title, there is no reason to expect

---

[11] Escape's disingenuous quotation of an October 11, 2013 joint letter to the Court concerning Escape's production is regrettable.  The letter states that: "The parties have cooperated and conferred at length over the past week, and Escape has made several additional document productions.  Some of these productions were very large in scale, and some documents were produced to EMI as recently as yesterday… As a result, EMI has not been able to complete its review of all the documents, and cannot say with certainty that the productions are complete and without errors.  However, EMI agrees that the documents produced appear on their face to address each of the pending discovery matters, and at this time EMI believes that it can move ahead under the existing Scheduling Order and submit its expert report by October 25, 2013." (Obj. Giger Decl. Exh D)  Escape quotes only the last sentence to imply that EMI confirmed Escape's productions as complete, omitting the specific statement to the contrary.  (Obj. 8)  As it turned out, Escape's production was not complete, facts that it took EMI a great deal of time to unravel given that the productions involved extensive database and source code repositories. (Semel Reply Br., ¶¶ 17-21)

that the MP3 list is suspect.  But EMI went further, and encouraged Escape to review the MP3 list, even providing Escape with the spreadsheet in native format to make its job easier.  (Semel Reply Decl. ¶14)  Escape has never claimed that it is unable to verify these results.

Thus, while purporting to challenge Dr. Horowitz's evidence, Escape "does not claim that a single MP3 file is incorrectly identified as an EMI work." (R 16)  Instead, Escape has attempted to portray this simple issue as a complicated evidentiary matter that has somehow caused Escape prejudice so as to let it evade summary judgment.  But Escape provides nothing that discredits the Report's finding that, "Escape submits no evidence regarding its own music library and data to try to dispute facts related to Horowitz's Audible Magic analyses.  Escape's hypothetical and unsubstantiated prejudice is far from adequate to justify preclusion under rule 37(c)(1), particularly where Escape possesses substantial information – its own data – that would allow it to determine whether the Audible Magic analyses were reliable, without the need for additional deposition and document requests." (R 16)

Because the Report's conclusion is so logically obvious, Escape is left to feign confusion as to how it could challenge Dr. Horowitz's evidence.  The answer is plain.  For example, Escape could *listen to* the MP3s to see if they embody the listed recordings.  Listening to the first full minute, one person could have spot checked MP3s for 10 percent of EMI's 2,807 listed works in just a few hours.  Alternatively, Escape could have used its digital fingerprinting technology if the few hours were too great a burden.  It is an undisputed fact that Escape has digital fingerprints of EMI works, and that Escape retained those for the specific purpose of preserving its capability to match content to those fingerprints for filtering purposes. (R 40; SUF 72-74)

Whether it employed a single person to listen or used its digital fingerprint technology to match the files to EMI's works, Escape's contention that Judge Netburn lacked grounds to decide whether Escape had sufficient time to address the evidence during the seven weeks that it

had to put in its summary judgment opposition is absurd.  It is also disingenuous, as Escape twice requested more time to complete its summary judgment briefing, and its request was granted both times.  (DE 56-59)  Escape never asked for nor claimed it required any more time. Escape had the burden to show prejudice, which it could not and did not do.  That is the end of the inquiry.[12]

Despite the fact that Escape has improperly sought to introduce new "evidence" with its Objection, it *still* fails to put in any evidence "that a single MP3 file is incorrectly identified." Escape has now had *six months* since EMI filed its summary judgment papers, yet it still has been unable to identify anything to challenge the evidence.  Surely, if Escape had actual evidence that EMI has misidentified MP3 files, it has not been shy about trying to introduce new evidence.  On this issue, it has not done so because it cannot.

Beyond these facts, the Report lays out an unassailable analysis with several independent grounds establishing why the evidentiary ruling is proper.  (R 12-16)  The remaining Objection arguments are simply restatements of arguments that were specifically and expertly addressed in the Report.

## 2.     Dr. Horowitz's Analysis of Escape's Data

Escape next challenges the presentation by Dr. Horowitz of straightforward evidence and statistics about the operation of the Grooveshark system.  This evidence is taken entirely from Escape's own records, and documented in precise detail to allow replication by Escape.  One wonders what Escape was thinking when it decided to malign the Report's five-page discussion

---

[12] We decline here to wade into Escape's new "evidence" in connection with its unavailing argument concerning the circumstances of its clearly late productions, which the Report held justified the timing of EMI's presentation of evidence.  The facts are well documented in the summary judgment papers, and Judge Netburn, who supervised the discovery process and Escape's repeated noncompliance, reviewed these facts and made the appropriate findings in EMI's favor.  (Reply Br. 18-19; Semel Reply Decl. ¶¶ 14-21)  While the new "evidence" submitted by Escape should not be allowed, it also does not change the Report's analysis or conclusion.

of this single issue, an analysis that provides more than twenty citations to fact and law, as a "rote acceptance" of EMI's argument. (Obj. 7)

To understand the insincerity of this objection, one needs to look at the data at issue. (SUF 131-147; Horowitz Decl., ¶¶ 67-76)  Dr. Horowitz simply ran queries of Escape's own database, queries that Escape had ample opportunity to replicate.  (R 18, fn 7)  The information consists of objective facts from *Escape's own records*, such as: how many users are on Grooveshark; how many songs are on Grooveshark; how many users have submitted files to Grooveshark, etc.  Dr. Horowitz produced in discovery and was deposed as to most of the facts, and attached the database "queries" – precise instructions that generate the various results – to his Declaration.

Beyond the heated rhetoric, Escape has not identified an actual issue.  Escape has not challenged the accuracy of *any* of these facts, which is not surprising since the queries are attached to the Declaration and the data comes from Escape.  Ignoring that its own delays in database production delayed Dr. Horowitz's analysis, and ignoring that Judge Netburn rejected any claim of prejudice, Escape claims it suffered "harm" without explaining how it was harmed.  It does not identify a single fact shown by Dr. Horowitz that is in error or that it could have challenged.

Escape has had every ability to query its own database at any time, not only in the seven weeks after EMI's motion was served but also long before it belatedly produced the database to EMI.  If it failed to do so (as opposed to pretending that it could not have done so), that is not prejudice.  That is a litigation choice Escape made, undoubtedly because it knows that the Horowitz analysis is entirely accurate.  For these reasons, as well as the detailed analysis in the Report and the summary judgment submissions, the Report finding is correct.

3.     **The Kowalski Declaration**

Escape's objections concerning the excluded Kowalski Declaration are immaterial as well as untenable.  The Report expressly notes that, even accepting the Kowalski Declaration, its analysis would be the same. (R 74 fn 22)  The Report actually considered the Kowalski Declaration despite the fact that it was the incompetent statement of a witness who Escape never identified as having any knowledge.

Unwisely trying to find some basis to justify the Kowalski Declaration, Escape argues that "Kowalski's testimony… should be considered 'impeachment' testimony." (Obj. 12)  As impeachment testimony, Kowalski's Declaration is of no use to Escape on this motion. "'[I]mpeachment evidence is not substantive evidence of the truth of the statements' and 'such potential impeachment evidence, therefore, may not be used to create a genuine issue of material fact for trial.'" *Metito (Overseas) Ltd. v. GE*, No. 05 Civ. 9478 (GEL), 2009 U.S. Dist. LEXIS 12590, at *15 (S.D.N.Y. Feb. 17, 2009) quoting *McMillian v. Johnson*, 88 F.3d 573, 1584 (11th Cir. 1996), *aff'd*, *McMillian v. Monroe County,* 520 U.S. 781 (1997).

In any event, the Kowalski Declaration is a "sham affidavit." (R 23-25; Semel Reply Decl., ¶¶ 26-35)  As the Report notes, "Kowalski does not submit any exhibits with his declarations and often fails to explain adequately how he reached his conclusions, thus preventing EMI from substantively responding in it reply brief." (R 23)  Further, his testimony includes "various statistics and broad statement about Escape's practices for which he provides no supporting evidence and threadbare, if any, explanations of how he arrived at his conclusions." (R 24-25)  The Report details the factual bases for the foregoing statements (amply supported by EMI's analysis of the Kowalski Declaration), but even just reading the Declaration

demonstrates its utter lack of substance.[13]

The remaining portions of the Objection not specifically addressed here are merely reiterations of arguments fully addressed in the Report itself and the underlying motion papers.

**D.      Issues Briefed That Were Not Reached
         Due To The Ruling Of Safe Harbor Ineligibility**

Since the Report found that the Section 512(i) threshold "condition of eligibility" for the DMCA safe harbor had not been met, it did not have to consider other grounds advanced by EMI in support of summary judgment dismissing Escape's DMCA safe harbor defense.  These arguments include that:

- The DMCA safe harbor does not apply to pre-1972 sound recordings. (Moving Br. 15)

- Escape's activities are not covered by Section 512(c) of the DMCA since Escape does not store content "at the direction" of users.[14] (Moving Br. 35-37; Reply Br 14-15)

- Escape does not meet the "financial benefit" test for the safe harbor under Section 512(c)(1)(B).  (Moving Br. 37-8; Reply Br. 14-15)

---

[13] With respect to the failure to identify Kowalski as a witness with knowledge, Escape's counsel submits new evidence seeking to show that Kowalski's name came up in depositions. (Obj. Giger Decl., ¶¶ 13-17)  To begin with, this issue cannot change the result since the Report holds that the Declaration violated the "sham affidavit" rule as well. (R 24-25)  Moreover, the deposition citations offered by Escape's counsel *support* the Report's conclusion that Kowalski's Declaration is inadmissible as lay witness testimony.  (R 25-27)  The depositions in this action show that Kowalski was discussed in two contexts, both related to investigating missing evidence in connection with discovery in this litigation.  Kowalski apparently looked into: (1) missing records cencerning takedowns and (2) the curious case of the manual deletion of all records of uploads by Escape's CTO Josh Greenberg, who personally received over 600 notices of infringement and yet whose entire history was wiped off the servers after litigation began. (SUF 142; Obj. Giger Decl., Exhs H, I)  These topics do not indicate Kowalski as a lay witness with personal knowledge concerning implementation of a repeat infringer policy.

[14] While not reaching this issues, the Report indicates the "Scylla and Charybdis" problem that Escape faces with this requirement.  (R 70-71)  On the one hand, Escape asks the Court to hold that it can "terminate" users yet still keep storing and publicly performing the millions of files they had submitted.  (Grooveshark user files are not kept in user accounts, but are all aggregated into Escape's central library.)  On the other hand, Escape must show that files are being stored "at the direction of the user" for ongoing DMCA protection.  Both cannot plausibly be true, and either one results in the loss of the DMCA safe harbor for Escape.

- Escape failed to implement a reasonable takedown of EMI's works under Section 512(c)(1)(A).  (Moving Br. 39-44; Reply Br. 17-18)

We respectfully submit that each of these issues stands as an independent ground for granting summary judgment and denying Escape any DMCA safe harbor protection, above and beyond Escape's failure to meet the Section 512(i) condition for eligibility on which the Report is based.

## **CONCLUSION**

For the reasons set forth herein, as well as those in the Report, the underlying motion papers and the supporting evidence, EMI respectfully submits that the Court should accept the Report in its entirety and grant EMI's motion for summary judgment accordingly.

Dated: New York, New York
      July 3, 2014

                    PRYOR CASHMAN LLP

                    By _____
                        Ilene S. Farkas (ifarkas@pryorcashman.com)
                        Benjamin K. Semel (bsemel@pryorcashman.com)
                        Erich C. Carey (ecarey@pryorcashman.com)
                        Donald S. Zakarin (dzakarin@pryorcashman.com)
                    7 Times Square
                    New York, New York 10036
                    (212) 421-4100

                    *Attorneys for Plaintiff Capitol Records, LLC d/b/a*
                    *EMI Music North America*