UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 5 2015
└─────────────────────────────────────┘
```

Capitol Records, LLC, d/b/a EMI Music North
America,

                    Plaintiff,

        –v–

Escape Media Group, Inc.,

                    Defendant.

12-CV-6646 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

Before the Court is the report and recommendation ("Report" or "R&R") of Magistrate

Judge Sarah Netburn dated May 28, 2014, Dkt. No. 90, regarding Plaintiff EMI Music North

America ("EMI")'s motion for summary judgment. EMI moved for summary judgment as to its

First and Sixth Claims for federal and common law copyright infringement. By stipulation,

Defendant Escape Media Group, Inc. ("Escape") conceded liability as to EMI's Second Claim

for breach of the parties' September 24, 2009 Digital Distribution Agreement ("Distribution

Agreement"). Dkt. No. 24. EMI did not move for summary judgment as to its Third Claim for

breach of the parties' September 24, 2009 Settlement Agreement and Mutual Release

("Settlement Agreement"), Fourth Claim for unjust enrichment, or Fifth Claim for unfair

competition, so those claims were not before Judge Netburn and are not before the Court now.

Judge Netburn recommended denying Escape's challenge to the declaration of Ellis Horowitz

and granting EMI's challenge to the declaration of Cole Kowalski. She also recommended

denying EMI's motion for summary judgment as to its claim for direct infringement of its right

of reproduction, but granting the motion as to its remaining copyright infringement claims and as

to Escape's affirmative defenses under the Digital Millennium Copyright Act ("DMCA") and

under the parties' Distribution and Settlement Agreements. Escape objects to Judge Netburn's

1

recommendations regarding (1) challenges to the Horowitz and Kowalski Declarations, (2) its entitlement to a DMCA safe harbor, and (3) the release of claims under the parties' prior agreements. For the reasons discussed below, the Court adopts Judge Netburn's recommendations in full.

## I.     BACKGROUND

Because Escape objects only to Judge Netburn's application of the law to the facts of this case, the Court adopts in full her recitation of the relevant facts. *See* R&R 27-41.[1] The Court assumes familiarity with this material.

## II.    STANDARD OF REVIEW

District courts may designate magistrate judges to hear and determine certain dispositive motions and to submit proposed findings of fact and a recommendation as to those motions. 28 U.S.C. § 636(b)(1). Any party wishing to object to a magistrate judge's report and recommendation must do so within fourteen days after being served with a copy of the report and recommendation. *Id.* If a party submits a timely objection to a report and recommendation, the district court reviews *de novo* those portions to which the party objected. *Id.*; *see also Norman v. Astrue*, 912 F. Supp. 2d 33, 39 (S.D.N.Y. 2012). Otherwise, if "no 'specific written objection' is made, the district court may adopt those portions 'as long as the factual and legal basis supporting the findings and conclusions set forth . . . are not clearly erroneous or contrary to law.'" *Norman*, 912 F. Supp. 2d at 39 (quoting *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226-27 (S.D.N.Y. 2008)). "A decision is 'clearly erroneous' when the reviewing Court is left with the definite and firm conviction that a mistake has been committed." *Courtney v. Colvin*, No. 13 Civ. 02884 (AJN), 2014 U.S. Dist. LEXIS 4559, at *3-4 (S.D.N.Y. Jan. 14, 2014) (quoting *Laster v. Mancini*, No. 07 Civ. 8265 (DAB), 2013 U.S. Dist. LEXIS 138599, at *6-7 (S.D.N.Y. Sept. 25, 2013)).

---

[1] Where the Court cites additional factual materials, it draws from the Reply Statement of Undisputed Facts ("RSUF"), Dkt. No. 85. If supported, and if Escape did not controvert the fact by pointing to admissible evidence, the Court "consider[s] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2); Local Rule 56.1(d); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, a court views all evidence in the light most favorable to the non-movant, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. But "[e]ven where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001). And if "a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense— on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element] of [the non-moving party's case].'" *Nw. Mut. Life Ins. Co. v. Fogel*, 78 F. Supp. 2d 70, 73-74 (E.D.N.Y. 19990 (quoting *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)).

## III. DISCUSSION

As noted, Escape objects to Judge Netburn's recommendations regarding (1) challenges to the Horowitz and Kowalski Declarations, (2) its entitlement to a DMCA safe harbor, and (3) the release of claims under the parties' prior agreements. EMI does not object to Judge Netburn's Report, including her recommendation that the Court deny its motion with respect to

3

direct infringement of its right of reproduction. The court will turn to issues relating to the declarations first and will then analyze the merits of the dispositive motion.

### A.     Objections to the Horowitz and Kowalski Declarations

Before delving into the merits of EMI's summary judgment motion, Judge Netburn addressed challenges concerning two declarations submitted by the parties. Judge Netburn recommended (1) denying Escape's challenge to the Horowitz Declaration and (2) granting EMI's challenge to the Kowalski Declaration. R&R 7.

Escape objects to both recommendations and contends that they should be reviewed *de novo* as if it had made an objection to a dispositive matter. The Court disagrees. Both Escape and EMI argued to Judge Netburn that the challenged declarations violated Rule 26, the Federal Rule of Civil Procedure governing discovery, and Judge Netburn properly noted that both parties' attempts to preclude the Court from relying on the declarations were based primarily on Rule 37, which provides certain sanctions for failures to make disclosures or to cooperate in discovery. Magistrate judges may, and often do, rule on nondispositive pretrial matters, including discovery disputes. Fed. R. Civ. P. 72(a). Contrary to Escape's suggestion, such nondispositive pretrial matters are reviewed for clear error. *Id.*; *see also* § 636(b)(1)(A).

Moreover, the fact that Judge Netburn efficiently resolved the Rule 37 sanctions in the same Report in which she provided recommendations as to the motion for summary judgment does not change the standard of review applied to the Rule 37 sanctions. *See Cardell Fin. Corp. v. Suchodolski Assocs.*, 896 F. Supp. 2d 320, 324 (S.D.N.Y. 2012) ("A district court evaluating a magistrate judge's report may adopt those portions of the report addressing non-dispositive matters as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." (citing Fed. R. Civ. P. 72(a)); *see also Arista Records, LLC v. Doe*, 604 F.3d 110, 116 (2d Cir. 2010) ("Matters concerning discovery generally are considered 'nondispositive' of the litigation." (quoting *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990)); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL) (RLE), 2000 U.S. Dist. LEXIS 4892, at *4 n.1

4

(S.D.N.Y. 2000) ("A decision to admit or exclude expert testimony is considered 'nondispositive' of the litigation." (collecting cases)). Therefore, the Court reviews Judge Netburn's recommendations concerning the Horowitz and Kowalski Declarations for clear error. Finding none, the Court adopts her recommendations to deny Escape's challenge to the Horowitz Declaration and to strike the Kowalski Declaration under Rule 37(c)(1).

### B.    Copyright Infringement

With one minor exception, Escape does not make any specific objections to Judge Netburn's conclusions of direct and secondary liability for copyright infringement. Rather, Escape primarily contends that there was no evidence from which copyright infringement could be found because it argued that the Horowitz Declaration should be excluded from the universe of facts at issue on this motion. As noted, the Court finds no clear error with Judge Netburn's discovery-related conclusions. Therefore, there is evidence from which copyright infringement can be found because Horowitz's analysis of Grooveshark's system revealed, *inter alia*, 2,807 EMI-copyrighted sound recordings were copied on Escape's servers in at least 13,855 separate files, and EMI-copyrighted works were streamed 12,224,567 times since March 23, 2012.

The only specific objection regarding copyright infringement that Escape raises is a footnote in its objection brief arguing that Judge Netburn "overlooked an important distinction between federal and New York law concerning 'public performance' rights in sound recordings." Obj.[2] 18 n.11. But Escape did not raise this point in its opposition to summary judgment, and it is well established that a party may not raise an argument in an objection to a report and recommendation of a magistrate judge that was not fairly presented to the magistrate judge in the first instance. *See, e.g., U.S. Bank N.A. v. 2150 Joshua's Path, LLC*, No. 13-CV-1598 (SJF), 2014 U.S. Dist. LEXIS 127596, at *4 (E.D.N.Y. Sept. 10, 2014) ("'A district court will generally not consider arguments that were not raised before the magistrate judge.'" (quoting *Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 Civ. 3920, 2012 U.S. Dist. LEXIS 72724, at *5

---

[2] Obj. stands for Escape's objection to Judge Netburn's Report (Dkt. No. 94).

(E.D.N.Y. May 24, 2012)).  Therefore, because Escape did not raise this argument before Judge

Netburn, the Court reviews Judge Netburn's conclusion on this point for clear error.

      Escape argues that it was error for Judge Netburn to hold that the elements for copyright

infringement under New York and federal law mirror each other and, therefore, may be analyzed

together.  Contrary to Escape's suggestion that Judge Netburn cited no authority for her

conclusion on this point, she relied on Judge Sullivan's opinion in *Capitol Records, LLC v.

ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013), which stated that "the elements for a direct

infringement claim under federal law mirror those for infringement of common law copyright

under [New York] state law."  R&R 51.  Judge Sullivan, in turn, relied on *Capitol Records, Inc.

v. Naxos of America, Inc.*, 830 N.E.2d 250, 265 (2005) ("*Naxos*"), which held that "New York

provides common-law copyright protection to sound recordings not covered by the federal

Copyright Act, regardless of the public domain status in the country of origin, if the alleged act

of infringement occurred in New York."  *ReDigi, Inc.*, 934 F. Supp. 2d at 658 n.8.  Like Judge

Sullivan, other judges in this Court have similarly relied on *Naxos* to conclude that New York

would recognize a right of public performance in sound recordings that would mirror the federal

copyright in such sound recordings.  *See, e.g., Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13

Civ. 5784 (CM), 2014 U.S. Dist. LEXIS 166492, at *25 (S.D.N.Y. Nov. 14, 2014) (interpreting

*Naxos* and other New York authority to predict that "the New York Court of Appeals would

recognize the exclusive right to public performance of a sound recording as one of the rights

appurtenant to common law copyright in such a recording").  The Court agrees with this

authority and, therefore, it finds no clear error with Judge Netburn's conclusion that the elements

for EMI's federal claims for copyright infringement mirror its state law claims for copyright

infringement.

      Because Escape does not make any specific objections to the remainder of Judge

Netburn's recommendations regarding copyright infringement, the Court also reviews those

conclusions for clear error.  *See, e.g., Watson v. Geithner*, No. 11 Civ. 9527 (AJN), 2013 U.S.

Dist. LEXIS 141009, at *5-6 (S.D.N.Y. Sept. 27, 2013).  Judge Netburn concluded that EMI had

established that it owns or has the exclusive right in the United States to enforce copyrights in 2,807 sound recordings. She further held that Escape directly infringes EMI's right of public performance, but that it does not directly infringe EMI's right of reproduction. Judge Netburn then concluded that Grooveshark users directly infringe EMI's rights of reproduction and distribution, and that Escape is secondarily liable for this infringement under theories of vicarious and contributory liability. The Court finds no clear error with these conclusions. Finally, because Judge Netburn observed that common law copyright infringement claims generally mirror those of federal claims, she found that EMI was entitled to summary judgment on its direct infringement claims—except with respect to its right of reproduction—and its secondary infringement claims for its pre-1972 recordings under New York common law. The Court finds no clear error with these conclusions.

Because the Court finds no clear error with Judge Netburn's copyright infringement recommendations, the Court adopts them in full. But before concluding that EMI is entitled to summary judgment, the Court must examine Escape's objections regarding its two affirmative defenses under the DMCA and under the parties' prior agreements.

## C.   DMCA Safe Harbor

Escape objects to Judge Netburn's recommendations about its non-entitlement to the DMCA safe harbor, so the Court reviews this issue *de novo*. The Court notes at the outset that it agrees with Judge Netburn's careful analysis of this issue, *see* R&R 52-79, and limits its discussion here to Escape's specific objections regarding Judge Netburn's conclusions.

As Judge Netburn noted, the DMCA added four safe harbor provisions to the Copyright Act in the form of 17 U.S.C. §§ 512(a)-(d), which shield service providers from liability for copyright infringement under certain circumstances. But to qualify for any of the DMCA safe harbors, the service provider must first satisfy the "conditions for eligibility" described in 17 U.S.C. § 512(i), which, among other things, require a service provider to have "adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or networks of, a policy that provides for the termination in appropriate circumstances of

7

subscribers and account holders of the service provider's system or network who are repeat infringers." § 512(i)(1)(A).  Like many courts, Judge Netburn isolated each component of § 512(i)(1)(A)'s repeat infringer policy requirement and then analyzed Escape's purported policy to see if it satisfied the statute.  *See, e.g., Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004) (noting a service provider must "(1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy."); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012) ("To fulfill the requirements of 17 U.S.C. § 512(i), a service provider must (i) adopt a policy that provides for the termination of service access for repeat copyright infringers; (ii) inform users of the service policy; and (iii) implement the policy in a reasonable manner." (citing *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004))).

Judge Netburn first noted that the repeat infringer policy that Escape informs its users of is not the same policy it purports to implement, but she generously concluded that Escape has "adopted" a repeat infringer policy based on its so-called "one strike policy."  She further concluded, and Escape agrees, Obj. 19, that the relevant repeat infringer policy for § 512(i) purposes is this so-called "one strike policy," not the policy set forth in Escape's Terms of Service.  Under its one strike policy, Escape purports to "disable[] account holders' upload privileges in response to DMCA notifications, but does not delete all data or audio files associated with their account or bar them from signing in to simply and passively use the Grooveshark website."  Obj. 19 (citing Hostert Decl. ¶¶ 24-29).  Judge Netburn concluded that this policy of only barring uploading privileges while retaining accounts does not satisfy the repeat infringer policy requirement because it does not actually "implement" a repeat infringer policy within the meaning of § 512(i), and, even assuming it did, Escape does not reasonably implement the policy, i.e., Escape does not terminate user's uploading privileges in appropriate circumstances.  *Cf. Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1110-15 (9th Cir. 2007)

("*CCBill*") (analyzing separately "implementation" and "reasonable implementation" under § 512(i)). Escape objects to both conclusions, which the Court addresses in turn.

### 1.   Actual Implementation

As Judge Netburn noted, Congress provided little guidance on the meaning of § 512(i)'s various requirements. But over time, courts have looked at certain recurring features to determine whether a service provider's repeat infringer policy is implemented within the meaning of § 512(i). For the reasons discussed below, the Court agrees with Judge Netburn that three such features are relevant here: (1) Escape's failure to keep adequate records of infringement; (2) Escape's practice of actively preventing copyright owners from collecting information necessary to issue DMCA takedown notifications; and (3) Escape's failure to "terminate" repeat infringers. Each of these shortcomings, standing alone, is sufficient to deny Escape's safe harbor defense.

### a)   Record Keeping

Beginning with adequate recordkeeping, Judge Netburn correctly noted that because "[t]he purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights," courts have recognized that "service providers that purposefully fail to keep adequate records of the identity and activities of their users and fail to terminate users despite their persistent and flagrant infringement are not eligible for protection under the safe harbor." *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011) ("*MP3tunes*") (citations omitted); *see also Disney Enters. v. Hotfile Corp.*, No. 11-20427-CIV-WILLIAMS, 2013 U.S. Dist. LEXIS 172339, at *67 (S.D. Fl. Sept. 20, 2013) ("*Hotfile*") ("[A] reasonable policy must be capable of tracking infringers."). Indeed, if records of infringement are not kept, it is impossible to know whether repeat infringement is occurring

Prior to Judge Netburn's Report, Escape consistently argued that it did not need to track repeat infringement because repeat infringement could not occur under its one strike policy. For example, Escape's opposition to summary judgment stated that "because it is Escape's policy to disable a user's uploading privileges following the receipt of *one* notice . . . there is no necessity

9

to search for 'repeat' infringers." Opp'n[3] at 36 n.14; *see also* Semel Decl. Ex. 1 (Hostert Dep. 136:12-140:23). Similarly, EMI's Local Rule 56.1 statement noted that "Escape has no policy to try to identify repeat infringers that are using Grooveshark." RSUF ¶ 91. Disputing this fact in its counterstatement, Escape stated that it "has a 'one strike' policy of terminating the uploading privileges of users associated with DMCA takedowns," RSUF ¶ 91, but this response does not actually dispute the fact that Escape does not try to identify repeat infringers. In addition, EMI provided evidence that Escape does not keep an independent record of the instances in which a user has received multiple DMCA takedown notices. RSUF ¶ 98. Escape countered this fact by arguing that "Escape's *database* includes records of every DMCA takedown processed, including the associated users," RSUF ¶ 98 (emphasis added), which essentially states that Escape could review its entire database to identify repeat infringers, but it does not controvert the fact that Escape does not keep an independent record of repeat infringers. These facts led Judge Netburn to conclude that "Escape does not try to identify repeat infringers and fails to keep records that would allow it to do so." R&R 64.

Now, however, Escape's objection retreats from its earlier contention that it does not need to keep records of repeat infringement under its one strike policy. Nonetheless, like its responses to EMI's Local Rule 56.1 statement, its objection fails to point to admissible evidence showing that it actually tries to identify repeat infringers who are using Grooveshark. For example, Escape's objection provides a detailed description of how it "records the removal of files in response to DMCA notices, *inter alia*, by moving data contained in its 'UsersFiles' table, which links each file on Grooveshark with the accountholder who submitted it, to a related data table entitled 'Deleted_UserFiles.'" Obj. 22. But Escape avoids mentioning that this "Deleted Database" does not distinguish between files deleted due to DMCA takedown notices and files deleted due to other reasons; i.e., this database is not an independent record of infringement.

---

[3] Opp'n stands for Escape's opposition to EMI's motion for summary judgment (Dkt. No. 77).

Due to the importance of adequate recordkeeping to the repeat infringer policy requirement, the Court agrees with Judge Netburn that because Escape purposefully fails to keep adequate records of repeat infringement, it does not satisfy the § 512(i) eligibility condition. *Accord Hotfile*, 2013 U.S. Dist. LEXIS 172339, at *28 (finding §512(i) not satisfied where the service provider's "repeat infringer policy was not tied to notices of infringement it received from copyright owners," and the service provider "did not track the notices and did not base its policy on how many notices were associated with certain users (such as by 'flagging' them)."); *see also MP3tunes*, 821 F. Supp. 2d at 637.

### b) Organization of User-Submitted Files

Not only does Escape fail to keep adequate records of repeat infringement, but it also employs a practice that prevents copyright owners from being able to identify repeat infringement in the first place. As Judge Netburn explained, Grooveshark's site organizes multiple files containing the same song together, but only the "Primary File" can be streamed by Grooveshark users. RSUF ¶ 117. When Escape receives a DMCA takedown notice for files that infringe a copyrighted work, only the Primary File linked to a song is removed, and, if there are Non-Primary Files associated with that same song, the song remains available to Grooveshark users because a new Primary File will be selected automatically from the Non-Primary Files the next time the song is selected for streaming. RSUF ¶¶ 119-22.[4] As aptly described by EMI's expert, the system acts as a technological Pez dispenser: Each time a Primary File for a song is removed due to a DMCA takedown notice, a Non-Primary File is slotted in to take its place, with the process continuing until there are no remaining Non-Primary Files for that particular song, and there is nothing to keep the Non-Primary Files from replenishing. Because it is not possible for content owners to obtain uniform resource locators (URLs) for Non-Primary Files, RSUF ¶ 124, and because the only URL visible to a user and content owners is the URL for the Primary File for a song, RSUF ¶ 125, content owners must submit successive takedown notices even for

---

[4] Escape disputed this statement of fact, but its citation to paragraphs 13-17 of the Hostert Declaration did not controvert this fact.

Non-Primary Files slotted behind Primary Files that have already received takedown notices. Judge Netburn concluded that this practice "may 'actively prevent copyright owners from collecting information needed to issue [DMCA] notifications' in a manner that would have any meaningful consequence." R&R 65 (quoting *CCBill*, 488 F.3d at 1109).

In its objection, Escape latches on to Judge Netburn's use of the word "may" to argue that she made an "equivocal statement [that] merely identifies a factual issue for determination at trial, rather than invalidating Escape's DMCA defense as a matter of law." Obj. 24. But Escape does not dispute any of the material facts at issue. Rather, its own description of its whack-a-mole practice belies any genuine dispute of material fact: "[T]he sole effect of Escape's 'primary file' practice is that only one of the grouped files is available on the website at a time, and thus visible to content owners [such as EMI]. While this may require content owners such as EMI to issue DMCA notifications *seriatim* - - *i.e.*, a notification addressed to the primary file, followed by Escape's removal of the content, and then, *if* the next primary file contains the same recording, issuance of a subsequent notice, etc. - - it does not 'prevent' copyright owners from policing the site." Obj. 24-25. Thus, Escape acknowledges that because of the way it organizes user-submitted files, content owners can only see URLs for Primary Files. It further acknowledges that it forces content owners to submit successive notifications for the Non-Primary Files slotted behind the Primary File even though the whole purpose of organizing the files in this way is to group together files representing the same song.

Other courts have rejected DMCA safe harbor protection for service providers employing similar practices that actively prevent copyright owners from enforcing DMCA takedown notifications in a meaningful way. In *In re Aimster Copyright Litigation*, for example, the defendant service provider instructed users on how to transfer their files in encrypted form, which led the court to conclude that "[a]dopting a repeat infringer policy and then purposely eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i)." 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002). On appeal, the Seventh Circuit affirmed, noting that "[f]ar from doing anything to discourage repeat infringers of the plaintiffs'

12

copyrights, Aimster invited them to do so, showed them how they could do so with ease using its system, and by teaching its users how to encrypt their unlawful distribution of copyrighted materials disabled itself from doing anything to prevent infringement." *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). Here, Escape did not teach its users how to encrypt their files to hide them from copyright owners—it hid the files on its own. Therefore, the Court agrees with Judge Netburn that the undisputed facts demonstrate that the way Escape organized user-submitted files actively prevented copyright owners from being able to issue meaningful DMCA takedown notifications, which is an independent basis for concluding that it did not "implement" a repeat infringer policy as § 512(i) requires. *Accord CCBill*, 488 F.3d at 1109 ("We hold that a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." (citing *Ellison*, 357 F.3d at 1080; *Corbis*, 351 F. Supp. 2d at 1102-03; *In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 659).

### c) Termination of Repeat Infringers

On top of the two above-noted problems with the implementation of Escape's repeat infringer policy, Judge Netburn found what this Court deems an even more fundamental problem with Escape's policy: As implemented, it does not actually "provide[] for the termination . . . of subscribers and account holders . . . who are repeat infringers." R&R 68 (quoting § 512(i)(1)(A)). Here it is important to distinguish between the policy that Escape informs its users of and the policy it purports to follow. The policy contained in Grooveshark's Terms of Service *does* provide for terminating the accounts of repeat infringers:

> Should [Escape] discover or be informed that you have posted User Content for which you do not personally own the copyright or otherwise do not have the necessary authority from the copyright owner, [Escape] may take all appropriate steps to rectify your noncompliance, including without limitation, disabling your ability to upload User Content to the Service, unless you provide [Escape] with a counter notification of your right to upload such User Content in compliance with our Copyright Policy. Should [Escape] discover or be informed that you continue to upload User Content for which you do not personally own the copyright or

> otherwise do not have the necessary authority from the copyright owner after
> [Escape] has made reasonable efforts to disable your ability to do so, you will be
> considered a repeat infringer, and [Escape] will terminate your account and delete
> all data associated with your account; remove all of the User Content you have
> uploaded/submitted to the Site; and use its reasonable efforts to prohibit you from
> signing up for another User account in the future.

Semel Decl. Ex. 14 at 4.  But, as noted above, it is undisputed that Escape does not actually

follow this policy; instead, it follows its one strike policy under which it purports to terminate the

uploading privileges of first-time infringers and, because it does not track repeat infringement, it

never determines whether a user should be deemed a repeat infringer.  Thus, under Escape's one

strike policy, the most severe consequence for a repeat infringer is loss of his or her uploading

privileges—Escape has not and will not terminate a repeat infringer's account regardless of the

level of repeat infringement.  Examining the statutory text and relevant case law, Judge Netburn

concluded that such a policy does not "implement" the type of repeat infringer policy that

§ 512(i) requires.  Once again, the Court finds Judge Netburn's rationale persuasive and Escape's

objections without merit.

First, Escape contends that "no court decision has actually held that 'termination'

necessarily means complete eradication of a user's account and deletion of all related content,

and Judge Netburn does not cite to any such decision."  Obj. 20.  But just because there is no

court opinion on point does not mean that Judge Netburn's analysis of the statutory language at

issue here was erroneous.  Rather, in navigating these uncharted waters, Judge Netburn correctly

noted that "the DMCA's safe harbors, as with all immunities from liability[,] should be narrowly

construed." *MP3tunes*, 821 F. Supp. 2d at 636 (citing *United States v. Texas*, 507 U.S. 529, 534

(1993)).  With this in mind, she began with the plain meaning of "termination," which is defined

as "[t]he act of ending something; extinguishment" and "[t]he end of something in time or

existence; conclusion or discontinuance."  Black's Law Dictionary (9th ed. 2009).  This

definition suggests that Congress intended service providers to have a policy in place that would

end or discontinue the accounts of repeat infringers, not something short of that such as limiting

repeat infringers' user privileges.  Escape offers no textual support for a contrary reading.

14

Second, Escape criticizes Judge Netburn for looking at the DMCA as a whole to determine the meaning of "termination" under § 512(i). Judge Netburn observed that 17 U.S.C. § 512(j), which addresses injunctive relief available under the DMCA, provides that the court may grant "[a]n order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, *by terminating the accounts of the subscriber or account holder* that are specified in the order." § 512(j)(1)(ii) (emphasis added). This language is in contrast to 17 U.S.C. § 512(g), which shields service providers from liability for taking down content and provides that "a service provider shall not be liable to any person for any claim based on the service provider's good faith *disabling of access to,* or removal of, *material or activity* claimed to be infringing or based on facts or circumstances from which infringing activity is apparent." § 512(g)(1) (emphasis added). Thus, Judge Netburn pointed out that Congress knew how to differentiate between *terminating* account holders and *disabling access* to material or *activity*, e.g., upload capabilities, claimed to be infringing. Escape argues that the comparison to § 512(g)(1) is irrelevant because it "refers to treatment of content, not account holders, and thus its language does not illuminate what Congress meant by 'termination' of account holders in § 512(i)." Obj. 20. But that is precisely the point. Escape's one strike policy prevents the uploading of *content*, but does not provide for the "termination of . . . *account holders*," which is what § 512(i) requires.

Moreover, Escape offers no authority for the point that limiting a repeat infringer's uploading privileges satisfies § 512(i). Although few courts have expressly discussed the meaning of "termination"—likely because the term is so clear as to be beyond doubt—the Court is not aware of any authority for the proposition that something short of complete termination of a repeat infringer's account satisfies § 512(i). Rather, the case law indicates just the opposite. *See, e.g., Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 513 (S.D.N.Y. 2013) ("*Vimeo*") (finding that defendant "demonstrate[d] that it took a clear position that those who chose to violate another's copyright would not be permitted to avail themselves of the service

15

[defendant] provides"); *MP3tunes*, 821 F. Supp. 2d at 638 (noting that repeat infringers "are blatant infringers that internet service providers are obligated to ban from their websites"); *Corbis*, 351 F. Supp. 2d at 1101 (describing approvingly a policy that informed "those accused of copyright infringement . . . that repeated violations could result in 'permanent suspension' from Amazon sites"); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 659 (describing a repeat infringer as one "whose access should be terminated"); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1177-78 (C.D. Cal. 2002) ("*Cybernet Ventures*") ("The Court does not read [§] 512 to endorse business practices that would encourage content providers to turn a blind eye to the <u>source</u> of massive copyright infringement . . . until a court orders the provider to terminate each individual account." (citing *Costar Grp., Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 705 (D. Md. 2001))).

Furthermore, Escape is incorrect that Judge Netburn's interpretation fails to serve the goals of the statute. To the contrary, multiple courts have noted that the service provider "must first establish that it adopted a policy providing for the termination of *access* for repeat infringers" and that "[t]his statutory requirement emanates from Congress' concern that 'those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that *access*." *Vimeo*, 972 F. Supp. 2d 500, 512-13 (S.D.N.Y. 2013) (quoting H.R. Rep. No. 105-551, Pt. 1, at 61 (1998)) (emphasis added); *see also* S. Rep. No. 105-190, at 52 (1998).

Third, Escape contends that Judge Netburn impermissibly "appeals to 'equity' to interpret the DMCA" because she "found that upholding Escape's practice of disabling uploads would 'benefit infringers' and allow 'Escape to further profit from repeat infringers' content." Obj. 20. The Court disagrees with Escape's characterization of this portion of Judge Netburn's analysis as an appeal to equity. Rather, Judge Netburn properly recognized that according to Escape the benefit of the DMCA safe harbor would take all the teeth out of the repeat infringer policy requirement. Other courts have similarly noted that "[m]aking the entrance into the safe harbor too wide would allow service providers acting in complicity with infringers to approach

copyright infringement on an image by image basis without ever targeting the source of these images." *Cf. Cybernet Ventures*, 213 F. Supp. 2d at 1177 (citing 17 U.S.C. § 512(c)(1)(C)).

Thus, for all the reasons described above, the Court agrees with Judge Netburn's conclusion that Escape does not "implement" a policy providing for the termination of repeat infringers as § 512(i) requires. Nor does the Court find any merit in Escape's objections to Judge Netburn's thorough and well-reasoned analysis. Moreover, Escape's improper recordkeeping, its "primary file" practice, and its failure to actually terminate repeat infringers each provide an independent ground for finding an absence of evidence to support Escape's entitlement to the DMCA safe harbor.

### 2.    Reasonable Implementation

Likewise, the Court agrees with Judge Netburn that, even assuming Escape's one strike policy could satisfy § 512(i)'s implementation requirement, its implementation of that policy is not reasonable, i.e., it is not carried out "in appropriate circumstances." *See Io Grp, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1144 (N.D. Cal. 2008) (noting that "'[a] service provider reasonably implements its repeat infringer policy if it terminates users 'when appropriate.'" (quoting *CCBill LLC*, 488 F.3d 1102 at 1111). For this portion of the analysis, the Court "assumes that Escape's purported policy and practice of disabling the uploading capabilities of repeat infringers constitutes 'termination' under § 512(i)(1)(A)." R&R 74. Therefore, the relevant question is whether Escape actually terminates the uploading privileges of repeat infringers under appropriate circumstances.

Although Judge Netburn cited multiple examples of Escape's failure to bar the uploading privileges of repeat infringers, *see* R&R 74-78, perhaps the most troubling example is Escape's so-called DMCA Lite procedure. Under this procedure, if Escape receives a DMCA takedown notification, but concludes that it is "defective," it will categorize it is a DMCA Lite takedown, which does not result in disabling the user's uploading ability. Escape deems takedown notifications defective if, for example, "they are not signed under oath or do not adequately identify the location of the alleged infringement on Grooveshark." Opp'n 39. But to be

"effective" under the DMCA, "a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes *substantially*" six delineated components. § 512(c)(3)(A) (emphasis added). These six components help the service provider locate the infringing content and determine whether the request is made in good faith on the part of a copyright owner. *Id.* Since February 13, 2013, Escape has removed only 6,861 files, but 94.2% of these have been removed under its so-called DMCA Lite procedure. RSUF ¶ 147. As Judge Netburn noted, the fact that Escape deemed 94.2% of DMCA notifications defective, but was still able to identify and remove the files, belies its contention that the notification did not "substantially" comply with § 512(c)(3)(A). Similarly, Escape offered no admissible evidence demonstrating how the vast majority of DMCA takedown notifications were effective enough for Escape to identify the user-submitted file, but so defective that they did not warrant terminating the user's uploading privileges.

But perhaps the strongest indicator of Escape's failure to terminate the uploading privileges of repeat infringers in appropriate circumstances is the undisputed facts showing that hundreds or thousands of users were not stripped of their uploading privileges after receiving notices of infringement. Notably, 1,609 users received DMCA takedown notices for an upload that occurred *after* the user had already received a prior DMCA takedown notice. RSUF ¶ 143. These 1,609 users submitted 2,339,671 files that are still available in Grooveshark's active library. RSUF ¶ 143. And at least 3,323 users for whom there is documentation of infringement in Escape's database still have their uploading privileges enabled. RSUF ¶ 131. The failure of Escape's purported one strike policy is all the more alarming when one considers that 21,044 users who have received multiple DMCA takedown notices account for 7,098,634 uploads, or 35% of all uploads to Grooveshark's active music library. RSUF ¶ 140.

In response to these statistics, Escape admits that "EMI has shown . . . that, in operating its 'one strike' policy, Escape does not have in place a process to check whether certain 'repeat infringers' have 'slipped through the cracks.'" Obj. 23. Escape then states that "[t]o the extent that [its] practice does not work as intended on any given occasion, for whatever reason – EMI

18

has identified 1,609 such instances (or a mere 4.2% of the number of recorded infringers) (see

Report at 63) – it is likely that those accountholders who do fall through the cracks will properly

be recorded as a result of the next DMCA notification addressed to one of their uploads." Obj.

23. But there is no reason to assume this would occur: As noted above, Escape argues that

"*because* it is Escape's policy to disable a user's uploading privileges following the receipt of

one notice . . . *there is no necessity to search for* 'repeat' infringers." Opp'n at 36 n.14. Thus,

Escape would have no way of knowing *if* repeat infringers were slipping through the cracks

because it makes no effort to track them. This admission alone demonstrates that Escape does

not reasonably implement its own policy because it does not have a way of checking to make

sure it is actually terminating users' uploading privileges in appropriate circumstances.

    As this extensive discussion reveals, EMI has shown that there is an absence of evidence

to support Escape's contention that it actually implements a repeat infringer policy or that its

repeat infringer policy is implemented in appropriate circumstances. Therefore, because there is

an absence of evidence to support Escape's satisfaction of the § 512(i) eligibility condition, no

reasonable jury could conclude that Escape is entitled to the § 512(c) safe harbor. The Court

need not reach the alternative arguments that Escape does not satisfy the remaining requirements

of § 512(c). In addition, because the Court concludes that Escape does not meet the eligibility

conditions of the DMCA safe harbor, it need not reach the issue of whether the DMCA safe

harbor extends to sound recordings fixed prior to 1972.

    **D.**    **Release of Claims in the Distribution Agreement**

    Finally, Escape argues that certain agreements entered into between it and EMI limit

EMI's possible recovery for copyright infringement. Escape objects to the portions of Judge

Netburn's report discussing this issue, so the Court reviews *de novo*. Although the Court agrees

with Judge Netburn's recommended outcome on this issue, the Court reaches this conclusion

under slightly different reasoning.

    By way of background, EMI first sued Escape for copyright infringement in May 2009.

*Capitol Records, LLC, et al. v. Escape Media Grp., Inc.*, 09 Civ. 04458 (LMM) (S.D.N.Y. May

8, 2009).  The parties ultimately settled that lawsuit and executed two separate contracts on

September 24, 2009: (1) the Settlement Agreement; and (2) the Distribution Agreement.  The

Settlement Agreement provides that

> [f]rom and after the date hereof, Escape Media shall not allow the copying,
> reproduction, distribution, public performance, and/or other exploitation of EMI
> recordings on, via, and/or in connection with the Grooveshark sites . . . except
> pursuant to a valid and binding agreement allowing such copying, reproduction,
> distribution, public performance, and/or other exploitation of EMI recordings (an
> 'EMI Content Agreement'), in accordance with the terms of such EMI Content
> Agreement.

McMullan Decl. Ex. 2 ¶ 1.1.  In exchange for $825,000, EMI released Escape "from any and all"

causes of action "that EMI has, had, or may claim to have, against [Escape] from the beginning

of time to the present, through the Effective Date of this Agreement, solely relating to allegedly

infringing or unauthorized use or exploitation of EMI Recordings on, via, and/or in connection

with the Grooveshark sites."  *Id.* at ¶ 5.1.

The Distribution Agreement granted Escape a license to distribute certain authorized EMI

content on Grooveshark and established detailed terms governing that distribution.  For example,

the Distribution Agreement provided that "use of EMI Content obtained from any entity other

than EMI or an Approved Source is a material breach of this Agreement."  McMullan Decl. Ex.

3 at ¶ 4.2.  In turn, EMI agreed to supply Escape with "EMI Content," which is defined as "any .

. . materials containing any content made available by EMI to [Escape] owned or controlled by

EMI."  McMullan Decl. Ex. 3 at Ex. 1 ¶ 19.  In exchange for this license, Escape was to make

certain payments and produce regular sales reports for the calculation of those payments.

On April 21, 2011, following EMI's notice of breach of the Distribution Agreement, the

parties entered into a First Amendment to the Settlement and Distribution Agreements.

McMullan Decl. ¶¶ 16-17; Tarantino Decl. ¶ 30, Ex. D.  The Amendment contained a release

providing that "EMI . . . hereby remises and releases Escape Media of any and all claims and

liability for or in respect of the Content/Usage/Accounting Claim for all periods prior to and

including December 31, 2010, excepting only claims arising under this Amendment." Tarantino

Decl. Ex. D ¶ 12.  The Amendment further provided that

> [o]ther than as amended hereby and by the Exhibits hereto, the Settlement and
> Distribution Agreements, and all of the terms thereof, remain in full force and
> effect according to their terms.  For the avoidance of doubt, unless explicitly
> amended herein, EMI Music's termination rights under the Distribution
> Agreement remain in full force and effect according to their terms.

Tarantino Decl. Ex. D. ¶ 14.  Following an additional notice of breach, the parties entered into a

Second Amendment of the Settlement and Distribution Agreements on November 29, 2011.

McMullan Decl. ¶¶ 16-17.  On January 25, 2012, EMI provided Escape with a new notice of

breach of the Distribution Agreement.  McMullan Decl. Ex. 5.  And on March 22, 2012, EMI

provided Escape with a notice of material breach and termination of the Distribution Agreement.

Tarantino Decl. Ex. E.

 In short, Escape argues that EMI cannot prevail on its copyright infringement claims for

post-March 22, 2012 streams of copyrighted sound recordings that were derived from files

impermissibly uploaded prior to March 22, 2012, because the Settlement Agreement and

Amendment to the Settlement and Distribution Agreement were still in force at this time.  It is

important to distinguish between claims based on uploads, which would presumably implicate

EMI's reproduction and distribution rights, and claims based on streams of those uploads, which

would presumably implicate EMI's public performance rights.  Escape acknowledges that "EMI

explicitly restricted its claims for violation of the right of 'public performance' to '*streams after

March 22, 2012.*'"  Obj. 17 (emphasis added).  Thus, EMI is not asserting copyright

infringement claims for the uploads that occurred during the duration of the Distribution

Agreement.  But Escape nonetheless contends that EMI cannot press claims for streams—i.e.,

infringement of its public performance rights—that occurred after March 22, 2012 if those

streams were from files that Grooveshark users uploaded prior to March 22, 2012.

 First, nothing in the parties' agreements can be construed to mean that EMI surrendered

its entire bundle of rights under the Copyright Act for all time based on a Distribution Agreement

that was terminated on March 22, 2012. EMI provided notice of breach of the Distribution

Agreement to Escape and afforded Escape the opportunity and requisite time to cure the noticed

breaches. Escape did not do so, which led EMI to terminate the Distribution Agreement as

provided for in the Agreement. Going forward, whatever rights Escape had in the Distribution

Agreement to stream EMI copyrighted content, regardless of when that content was acquired,

ceased to exist.

Second, Escape's argument overlooks the fact that the Settlement Agreement, which

remains in effect, provides that "Escape media shall not allow the copying, reproduction,

distribution, *public performance*, and/or other exploitation *of EMI Recordings . . . except*

*pursuant to a valid and binding agreement* allowing such copying reproduction, distribution,

public performance, and/or other exploitation of EMI Recordings (an 'EMI Content

Agreement')." (emphasis added). In line with this understanding, EMI's March 22, 2012 notice

of material breach and termination stated that "Pursuant to Paragraph 13.3 of the Distribution

Agreement, we hereby demand that Grooveshark: (1) immediately cease any exploitation of EMI

Content, (b) destroy all EMI Content and EMI Confidential Information in its possession or

control and certify the same to EMI in writing." Assuming that EMI could not bring a breach-of-

contract claim based on the impermissible user uploads during the duration of the Distribution

Agreement, Escape still did not have the right to "allow the . . . public performance [i.e.,

streaming] . . . of EMI Recordings" of those impermissible uploads following termination of the

Distribution Agreement after March 22, 2012 based on the still-in-force Settlement Agreement.

Nor is this conclusion regarding post-March 22, 2012 streams called into question by the

limited authority that Escape cites in support of its theory. Escape relies on *Graham v. James* for

the proposition that "[a] copyright owner who grants a nonexclusive license to use his

copyrighted material waives his right to sue the licensee for copyright infringement." 144 F.3d

229, 236 (2d Cir. 1998) (citing *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir.

1997); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1338-39 (9th Cir. 1990)).

*Graham* further observed that, "[g]enerally, 'if the [licensee's] improper conduct constitutes a

breach of a covenant undertaken by the [licensee] . . . and if such covenant constitutes an enforceable contractual obligation, then the [licensor] will have a cause of action for breach of contract,' not copyright infringement." *Id.* at 236 (citing 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.15[A], at 10-120). However, "as the several courts of this Circuit have found, use of copyrighted material after a license to use the material has expired gives rise to [a] claim for copyright infringement."[5] *Clinical Insight, Inc. v. Louisville Cardiology Med. Grp., PSC*, No. 11-CV-6019T, 2013 U.S. Dist. LEXIS 97689, at *33 (W.D.N.Y. July 12, 2013) (citing *Marshall v. New Kids On The Block Partnership*, 780 F. Supp. 1005, 1009 (S.D.N.Y. 1991) ("Case law in this Circuit indicates that a copyright licensee can make himself a 'stranger' to the licensor by using the copyrighted material in a manner that exceeds either the duration or the scope of the license."); *Wu v. Pearson Educ., Inc.*, 277 F.R.D. 255, 267 (S.D.N.Y. 2011) ("After expiration of a license, further exercise by the licensee of the licensed exploitation rights constitutes copyright infringement."); *Basquiat v. David DeSanctis Contemporary Art, Inc.*, No. 09 Civ. 1025 (PKC), 2010 U.S. Dist. LEXIS 116292, at *3 (S.D.N.Y. Oct. 29, 2010) ("A sale by a licensee after the expiration of a license may amount to copyright infringement.")). In sum, the parties' agreements do not prevent EMI from bringing copyright infringement claims based on the continued exploitation of user uploads that occurred prior to March 22, 2012.

IV.   **CONCLUSION**

For the reasons stated herein, Judge Netburn's recommendations are adopted in full. Therefore, EMI's motion for summary judgment as to its Fifth and Sixth Claims for federal and

---

[5] For this reason, the relevant cut-off date for EMI's copyright claims based on streaming content is March 22, 2011, not December 31, 2010 as Judge Netburn appeared to believe. R&R 41. December 31, 2010 is the purported release-of-claims date while March 22, 2011 is the agreement's termination date. Thus, while EMI is correct that "Escape *cannot quote any release language covering*" the period December 22, 2011 to March 22, 2011, EMI Resp. 16 (Dkt. No. 97), the case law is clear that claims for copyright infringement arising during this time period would be limited to breach of contract in light of the parties' agreement. But as noted in the text, Escape's argument is incorrect insofar as it concerns continued exploitation of EMI content that it received prior to March 22, 2011.

common law copyright infringement is GRANTED except with respect to its claims for direct infringement of its right of reproduction.  This resolves Dkt. No. 71.

The Court hereby schedules a case management conference for Friday, May 8, 2015 at 11:30 a.m.  No later than May 1, 2015, the parties shall submit a joint letter to the Court providing proposed trial dates and a proposed schedule for pre-trial submissions.  The letter shall also indicate when further settlement talks will take place and whether the parties would like a referral to the Magistrate Judge or the Court-annexed mediation program for settlement.


SO ORDERED.

Dated: Mar 25    , 2015
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

24